**William Dan DeFORD, Petitioner,**

v.

**SECRETARY OF LABOR, Respondent,**

**and**

**Tennessee Valley Authority, Intervenor.**

**TENNESSEE VALLEY AUTHORITY, Petitioner,**

v.

**SECRETARY OF LABOR, Respondent.**

**Nos. 81–3228, 81–3254 and 81–3401.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 4, 1982.

Decided Feb. 10, 1983.

Thomas M. Hale, and James A. Ridley, III, argued, Kramer, Johnson, Rayson, McVeigh & Leake, Knoxville, Tenn., for petitioner.

Herbert S. Sanger, Jr., Gen. Counsel, James E. Fox, Assoc. Gen. Counsel, Justin M. Schwamm, Sr., Asst. Gen. Counsel, Robert E. Washburn, and E. Claire Garland, T.V.A., Knoxville, Tenn., for T.V.A.

Barry S. Sandals and Kathryn A. Oberly, argued, Dept. of Justice, Washington, D.C., for respondents.

Before ENGEL and MERRITT, Circuit Judges, and MORTON,* Chief District Judge.

MORTON, Chief Judge.

This appeal concerns three consolidated petitions for review of Orders rendered by the Secretary of the United States Department of Labor (Secretary) pursuant to the Energy Reorganization Act of 1974, as amended, 42 U.S.C. § 5851, and regulations promulgated thereunder. Petitioners are William Dan DeFord (DeFord) and the Tennessee Valley Authority (TVA). The Secretary, in sum, awarded relief to DeFord upon finding that TVA had illegally discriminated against DeFord because he assisted or participated in a Nuclear Regulatory Commission (NRC) investigation at a TVA facility.

## I.

DeFord was initially employed by TVA in 1971, and worked in the Electrical Engineering Branch of the Office of Engineering Design and Construction. During 1972 DeFord was assigned to TVA's Quality Engineering Branch and became a manager in the Quality Assurance Engineering Section. His responsibilities included ascertaining that various construction standards and specifications were complied with at TVA's Sequoyah Nuclear Plant, which was being built near Chattanooga, Tennessee.

During July 1980, officials from the NRC made a routine inspection of the Sequoyah project. DeFord participated in the NRC investigation and discussed certain problems and concerns of the quality assurance staff with NRC personnel. Two weeks after the NRC investigation was conducted, TVA officials met with NRC representatives in Atlanta, Georgia. At this meeting, NRC officials apprised TVA of the NRC's findings and rather strongly emphasized in particular their concern with respect to quality. assurance on TVA construction sites. Along the way, TVA began its own investigation of the NRC findings. DeFord was among the quality assurance staff members who were interviewed as part of this internal audit.

On August 11, 1980, DeFord was notified that a problem in his section had been revealed by the TVA audit. He was told that he was being transferred back to the Electrical Engineering Branch. Upon reporting to that division DeFord allegedly found that he was not welcome, that he was no longer a supervisor, and that his job was by no means secure.

On September 10, 1980, DeFord filed a claim with the Department of Labor, alleging that his transfer was the result of deliberate discrimination by TVA against him due to his participation in the NRC inspection process. He stopped working on September 11, 1980, and was hospitalized ten days later for observation. DeFord has testified that upon suffering the embarrassment and humiliation that accompanied his transfer, he developed chest pains, encountered difficulty in sleeping, and began suffering from severe depression. A lengthy and complicated administrative process, set in motion by the filing of the aforementioned discrimination claim, has culminated in the instant proceeding.

## II.

After an *ex parte* investigation of DeFord's charge was conducted, in accordance with 42 U.S.C. § 5851(b) and applicable regulations, the Administrator for the Labor Department's Wage and Hour Division notified TVA by letter that "the weight of evidence to date" supported DeFord's claim of discrimination. Further, the letter stated that relief should be accorded, as follows:

1. Mr. William Dan DeFord is to be reinstated to either the M–5 Quality Assurance Engineering Section supervisory position held by him prior to August 11, 1980, *or* Mr. DeFord is to be assigned to a comparable M–5 supervisory position which is acceptable to him.

---

* The Honorable L. Clure Morton, Chief District Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

2. Mr. DeFord is to be given written assurances that his conditions and privileges of employment will not be adversely affected as a result of his involvement in the U.S. Department of Labor's action under the Employee Protection Provisions of the Energy Reorganization Act (ERA) Public Law 95–601, Section 21, 42 U.S.C. 5851.

3. Mr. DeFord is to be placed on administrative leave (leave with full pay) which will cover the period from September 12, 1980, until such time that competent medical authorities determine that he is able to return to work.

4. Mr. DeFord is to be reimbursed for all medical and/or legal expenses incurred by him during the period from August 11, 1980, to date.

Both DeFord and TVA appealed from this decision to the Labor Department's Office of Administrative Law Judges.

After a full, formal hearing in Knoxville, Tennessee, the administrative law judge (ALJ) essentially concurred with the decision referred to above. In addition, the ALJ found that DeFord was entitled to compensatory damages in the amount of $50,000. Although the ALJ's written decision was phrased in mandatory terms, it was forwarded in due course to the Secretary as a "recommended decision" along with the hearing record.

Upon review of the ALJ's findings of fact, conclusions of law, and proposed order, the Secretary issued a ruling which stated, in pertinent part, as follows:

On the basis of the entire record, it is my conclusion that the findings and conclusions in the Judge's recommended decision of January 7, 1981, with respect to whether DeFord was discriminated against in violation of the Act are supported by the evidence in the record and are proper, and I adopt them as my own. Accordingly, I find that the respondent, the Tennessee Valley Authority, violated Section 210 of the Act (42 U.S.C. 5851) by discriminating against the complainant

because of activities protected by that Section.

I do not agree with the Administrative Law Judge's conclusion that medical expenses and damages to reputation resulting from discrimination prohibited by the Act are recoverable by a claimant under 42 U.S.C. 5851. I find that the Administrative Law Judge erred in holding that damages for these items may be recovered under that provision. Such items do not come within the intended scope of the remedy provided thereby. See the legislative history of 42 U.S.C. 5851, 1978 U.S. Code Cong. and Adm.News, p. 7303.

Accordingly, the respondent, the Tennessee Valley Authority, is hereby ordered:

(1) to reinstate William Dan DeFord to the supervisory position held by him immediately prior to August 11, 1980, at the same grade and pay, and under the same terms, conditions, and privileges of employment, or to assign him to a comparable position with comparable responsibilities at the same grade and pay;

(2) to place him on administrative leave with full pay, rather than sick leave, from September 12, 1980, until such date as he is able to return to work;

(3) to cease discrimination against him in any manner with respect to his compensation, terms, conditions, or privileges of employment because of actions by him to carry out the purposes of the Energy Reorganization Act of 1974, as amended, or because of his participation in this proceeding;

(4) to pay him the aggregate amount of all costs and expenses (including attorney fees) reasonably incurred by him in connection with this proceeding, as shall be determined by me on application together with supporting data, pursuant to 42 U.S.C. 5851 and 29 CFR 24.6(b)(3).

Pursuant to this decision, the Secretary by subsequent order awarded certain attorneys' fees and expenses to DeFord in the total amount of $9,392.00. This figure re-

flected a deduction of fees and costs which the Secretary viewed as having been incurred in pursuit of "a claim for damages for pain, suffering and mental anguish, injury to reputation, and medical expenses allegedly suffered by DeFord." Because the Secretary held that such damages were not recoverable, he also disallowed fees and expenses which he deemed related to such a claim.

DeFord sought by motion to have the Secretary amend his decision as it touched upon reinstatement to the same position "or ... to a comparable position," such that reinstatement would instead be ordered to the same position "or ... to a comparable position which is acceptable to him." By separate motion, TVA sought an order staying enforcement of the Secretary's decision pending disposition of this appeal. Both motions were denied by the Secretary.

Both TVA (No. 81–3254) and DeFord (No. 81–3228) have sought review here of the Secretary's decision. In addition, DeFord seeks review of the Secretary's determination that attorneys' fees and expenses should be awarded in an amount less than that which he requested (No. 81–3401). By order filed on November 6, 1981, a panel of this Court, with one judge dissenting, stayed enforcement of the Secretary's decision. The three petitions were consolidated, and oral argument was heard on November 4, 1982.

### III.

Several allegations are lodged by TVA against the procedural and evidentiary foundations of the Secretary's decision. As an initial matter, it is claimed that the burden of proof, with respect to both production and persuasion, was misapplied. But it is well recognized that the linchpin of TVA's challenge is and must be a claim that the Secretary's findings were not supported by substantial evidence. If substantial evidence underlay the Secretary's determination, reached after a full and fair hearing and upon review of the record as a whole, adjusting the order of proof and dissecting the offhand comments of an ALJ would become academic exercises of little or no value.

### A.

Even if they are considered in isolation, TVA's contentions regarding allocation of the burden of proof do not withstand scrutiny. No violence was done to TVA's rights with respect to the burden of production, for DeFord took on that burden just as TVA now argues that he should. As to the burden of persuasion, TVA openly questioned whether DeFord had produced evidence supporting his claim before it put on any proof and also after it brought forth proof of its own. The ALJ ruled that DeFord had produced evidence in support of his claim such that the hearing should continue, in the former instance, and ruled against TVA in the latter. Certainly TVA is free to dispute the propriety of those rulings here, but the key question remains whether evidence presented at the hearing supported those decisions.

If a choice must be made among guiding standards for allocating the burden of proof under the antidiscrimination provisions of the Energy Reorganization Act, it would appear obvious that a court should look to cases construing the National Labor Relations Act (NLRA) rather than to those dealing with Title VII. See S.Rep. No. 95–848, 95th Cong., 2d Sess. 29, *reprinted in* [1978] U.S.Code Cong. & Ad.News 7303, 7303; *Consolidated Edison Co. v. Donovan,* 673 F.2d 61, 62 (2d Cir.1982). But the distinction makes little difference here. With all niceties aside, once DeFord offered evidence from which the inference of illegal discrimination could be drawn, TVA had an opportunity to show that the actions it took with respect to DeFord were based upon legitimate nondiscriminatory reasons. If the evidence which was presented at the hearing did not carry the day, substituting terms such as "prima facie case" or "mere pretext" into the ALJ's discourse will not allow TVA to fare better.

### B.

In order to examine the evidence properly in this case, the essential elements of a

discrimination claim under the Energy Reorganization Act must, of course, be determined. By its terms, section 5851(a) prohibits certain employers from discriminating in practically any job-related fashion against an employee because the employee participated in NRC investigatory or enforcement proceedings. The particular elements of a valid discrimination claim would appear most obviously to include proof: (1) that the party charged with discrimination is an employer subject to the Act; (2) that the complaining employee was discharged or otherwise discriminated against with respect to his compensation, terms, conditions, or privileges of employment; and (3) that the alleged discrimination arose because the employee participated in an NRC proceeding under either the Energy Reorganization Act of 1974 or the Atomic Energy Act of 1954. In light of the statutory language itself and such underlying legislative history as may be found, there would appear to be no reason for requiring proof that goes further than these three basic elements would require.

■ It has been suggested by TVA that DeFord should be required to show that he disclosed unique evidence to the NRC, or evidence that TVA attempted to hide, in order to make out a case. This contention is expressly rejected. The purpose of the Act is to prevent employers from discouraging cooperation with NRC investigators, and not merely to prevent employers from inhibiting disclosure of particular facts or types of information. Under this antidiscriminatory provision, as under the NLRA, the need for broad construction of the statutory purpose can be well characterized as "necessary 'to prevent the [investigating agency's] channels of information from being dried up by employer intimidation,'" *NLRB v. Schrivener,* 405 U.S. 117, 122, 92 S.Ct. 798, 801, 31 L.Ed.2d 79, 82–83 (1972), and the need to protect an employee who participates in agency investigations clearly exists even though "[h]is contribution might be merely cumulative," *id.* at 123, 92 S.Ct. at 802, 31 L.Ed.2d at 84. *Cf. NLRB v. Retail Store Employees Union,* 570 F.2d 586 (6th Cir.), *cert. denied,* 439 U.S. 819, 99 S.Ct.

81, 58 L.Ed.2d 109 (1978) (discrimination established under § 8(a)(4) of NLRA although employee provided no information at all during agency proceeding).

■ It has also been suggested by TVA that DeFord should be required to prove that he was treated differently from other similarly situated participants in the NRC investigation, but this contention as well must be rejected. Inclusion of such a requirement among the elements of a claim would take no account of the possibility that more than one person might be exposed to the same type of discrimination. The statute is aimed at preventing intimidation, and whether the scope of such activity happens to be narrow or broad in a particular case is of no import. An employer should not escape liability upon an otherwise valid claim, for example, solely because it chose to discriminate against three similarly situated employees rather than only one; yet inclusion of the suggested factor as a required element of proof would allow precisely such a result to obtain. *Cf. NLRB v. Jemco, Inc.,* 465 F.2d 1148, 1152, (6th Cir.1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 911, 34 L.Ed.2d 690 (1973) (refusal to countenance "the somewhat absurd result that an employer could never be found in violation of [section 8(a)(3) of the NLRA] so long as he was careful to treat all employees alike, no matter how destructive of employee rights his conduct may be").

Turning to the facts at hand, it is not questioned that TVA is an employer subject to the Act, and it is conceded that DeFord participated in an NRC proceeding within the purview of the Act. When DeFord was transferred, his rate of compensation was not changed. The only points that were controverted at the administrative hearing in this case, then, concerned whether DeFord suffered a change with respect to terms, conditions, or privileges of employment in the nature of a demotion or other form of discrimination, and whether the alleged change of jobs represented discrimination against him because he participated in the NRC investigation.

The Secretary, adopting the opinion of the ALJ, found that DeFord suffered a demotion upon being transferred from one job to another because "the new job was far less attractive and prestigious than his previous position," and because "[h]e was assigned tasks that were below his proven capabilities and he had no supervisory responsibilities." Moreover, the Secretary indicated that DeFord received treatment which was somewhat less than cordial after he reported to his new job. Evidence was presented to the effect that DeFord went from a position in which he supervised several other engineers to a position in which he supervised nobody and was assigned work that included certain essentially clerical functions; that he was moved from an office of his own to a work table which he shared with a lower-grade engineer in an open room called "the bullpen," where he did not even have a telephone; and that he was transferred from a management position in the quality assurance section to a position in which he was told—even when he performed work related to quality assurance—that he would "remain invisible" with respect to quality assurance, and not even sign his name to reports that are habitually signed by the engineer responsible for them. These items of proof, without more, represent substantial evidence that DeFord was demoted and, in the context of this case, provide substantial support for the correlative finding of discrimination made by the Secretary.

The Secretary found "that DeFord's transfer was a deliberate retaliation for his cooperation with NRC and his attempts to get his Quality Assurance Engineering section recognized by the management." There was evidence that TVA did not follow its normal procedure in transferring DeFord, but rather that it unceremoniously dumped him from the quality assurance section shortly after the NRC investigation. There was evidence that DeFord had received superior performance ratings prior to the NRC investigation, although TVA claimed in defense of the transfer that he had performed badly in his job. There was evidence that DeFord worked well with his immediate supervisors and had not developed personality conflicts that would interfere with effective performance of his job. There was evidence that DeFord was singled out, in what was admittedly intended to be a negative remark, as a "very strong individual . . . who is instrumental in influencing the opinion and operation of the staff and input to management" and that such criticism of DeFord as a "strong individual" did not arise until TVA conducted its internal audit of the NRC's findings. Quite simply, there was substantial evidence to support the Secretary's conclusion that DeFord was demoted *solely* because he participated in an NRC proceeding. *Cf. NLRB v. Lloyd A. Fry Roofing Co.,* 651 F.2d 442, 446 (6th Cir.1981) ("In this Circuit, if a discharge is motivated 'in part' by an employee's protected concerted activities the discharge violates section 8(a)(1) of the [NLRA].").

It is obvious that judgments regarding the credibility of proffered evidence were required, but they are not to be reviewed here. In the Secretary's opinion, alternative explanations offered by TVA for the actions taken against DeFord either would not bear their own weight or were for other reasons simply not worthy of belief. Such an opinion is justifiable in light of the evidence, and will not be disturbed.

## IV.

Various questions are raised by TVA and DeFord concerning relief awarded by the Secretary. For the most part, they are answerable by reference to rather clear and unambiguous statutory language. Once discrimination is found that is prohibited by the Act,

> the Secretary shall order the person who committed such violation to (i) take affirmative action to abate the violation, and (ii) reinstate the complainant to his former position together with the compensation (including back pay), terms, conditions, and privileges of his employment, and the Secretary may order such person to provide compensatory damages to the complainant. If an order is issued

under this paragraph, the Secretary, at the request of the complainant shall assess against the person against whom the order is issued a sum equal to the aggregate amount of all costs and expenses (including attorneys' and expert witness fees) reasonably incurred, as determined by the Secretary, by the complainant for, or in connection with, the bringing of the complaint upon which the order was issued.

42 U.S.C. § 5851(b)(2)(B). The remedy fashioned by the Secretary contained several interrelated components. As the discussion below indicates, it will be necessary to remand this case so that the Secretary can revise the entire package.

### A.

■ DeFord has taken issue with the Secretary's determination that medical expenses and other damages which the ALJ included in his recommendation are not allowable under section 5851. Boiled down to its essence, the Secretary's response is that although Congress provided for "compensatory damages" it did not actually mean to provide for "compensatory damages." As an explanation for this curious pose, inference is stacked upon inference in support of a claim that the legislative history behind section 5851 by some means makes the intent of Congress "very doubtful." Thus, the Secretary would in effect suggest that the reference to "compensatory damages" is only intended to protect employees from a loss of such things as retirement benefits.

Neither the Secretary's approach nor his reasoning can be approved on this point. Where language in a statute is clear, there is no reason why construction of the statute should be approached initially by referring to its legislative history. Congressional discussion can be helpful in some instances to resolve ambiguities, but it should not be relied upon to create them. Here, it is clear that Congress intended to allow "compensatory damages," and nothing less. The statute is not ambiguous on this point. The Secretary admits, as he well should, that we must not read an entire term out of the statute. In the same vein, we should not go

into contortions and "reason" it out of the statute. Even a cursory reading of section 5851(b)(2)(B) discloses that "compensatory damages" are allowable *in addition to* abatement of discrimination, reinstatement with back pay, and restoration of all job-related entitlements such as retirement benefits. On remand, the Secretary will give full effect to all terms of the statute.

During oral argument of this case, mention was made of a question whether the Secretary's authority to grant compensatory damages for claims essentially sounding in tort might raise a constitutional issue in some future case touching upon the right to a jury trial. No such question is presented in this case, and it should be made clear that neither this nor any other constitutional issue is addressed here.

### B.

DeFord questions the award of attorneys' fees and expenses in this case. That issue, in light of the way it was handled in the Secretary's decision, is related to the issue of compensatory damages. The Secretary denied all fees and expenses connected with the damages claim because DeFord was not deemed entitled to prevail on that claim.

■ Since this case will be remanded for consideration of compensatory damages, it is obviously appropriate for the Secretary to reconsider his decision concerning fees and expenses. In passing, some additional comments are proper. Section 5851 provides that once discrimination is shown the Secretary "shall assess . . . all costs and expenses . . . reasonably incurred . . . for, or in connection with, the bringing of the complaint." It is for the Secretary to determine whether expenses were "reasonably incurred," but otherwise no discretion rests in him. Therefore, even if a complainant does not ultimately receive compensatory damages or other particular relief which is sought, it would not be proper for the Secretary to deny fees and expenses unless he determines first that they were not "reasonably incurred." To state the matter otherwise, a lack of success on the merits

should not be viewed as the talisman of unreasonableness. The statute refers to recovery of expenses for "the bringing of the complaint," and not just to expenses associated with individual aspects of a case.

## C.

DeFord has objected to the Secretary's decision as it concerns reinstatement, on the basis that it "gives TVA the option of where to assign him, . . . and falls short of [DeFord's] statutory right to be reinstated to his former position." DeFord's arguments on this point reflect mistrust of an employer that has discriminated against him previously in making job assignments, and it cannot be said that his mistrust is unfounded. Throughout this proceeding, it might be recalled, TVA has contended that DeFord was not demoted at all when he was transferred from the quality assurance section to "the bullpen." Yet the Secretary's decision would allow TVA, ostensibly in the exercise of its discretion, to either reinstate DeFord to his old job *or* give him a "comparable position."

Section 5851(b)(2)(B) provides that an aggrieved party shall be reinstated "to his former position." In the absence of a clear indication why this language cannot be given effect, the Secretary shall do precisely that on remand. There is no sign in the record that DeFord's previous job has ceased to exist, and in any event it would certainly appear that the Secretary or perhaps DeFord, as opposed to TVA, should control the decision whether an alternative job must be found.

## D.

The Secretary ordered that DeFord be placed retroactively on administrative leave with full pay. This remedy is challenged by TVA as an invention of "terms, conditions, and privileges" which were not previously available to DeFord in connection with his employment and which should not be made available under the guise of making him whole.

The remedies provided for by Congress do not offer the Secretary an opportunity to order any type of relief whatsoever that he might deem appropriate. He can order abatement of discrimination, restore an employee to his job with all attendant benefits including back pay, award compensatory damages, and award all reasonable expenses incurred in pursuit of the action. But the statute does not by its terms allow the creation of administrative leave that would not otherwise exist.

The position of TVA appears to be that if leave granted in this case by the Secretary is set aside, DeFord might either have the option of exercising or be compelled to exercise certain rights under the Federal Employees' Compensation Act (FECA), 5 U.S.C. § 8101 *et seq.* To put the matter in perspective it can be said that such rights are representative of "terms, conditions, and privileges" which are potentially available to DeFord as an employee of TVA. *See* 16 U.S.C. § 831b. At first glance, a hybrid remedy of sorts under both section 5851 and the FECA would not appear to raise any difficulty. Upon closer examination, however, we find that no such result is warranted here.

The Secretary has addressed three areas of concern should the FECA come into play. It is suggested first that the FECA only assures reinstatement to a particular job when an employee recovers from a disability and is able to return to work within one year; second, that compensation awarded under the FECA is not premised upon fault, is not reviewable by a court, and may not be adequate in a given case; and third, that because FECA entitlements are not dependent upon fault the deterrent effect of fault-grounded orders issued by the Secretary might be lost. All of these concerns might be touched upon by noting that availability of FECA remedies should not detract from the authority granted in 42 U.S.C. § 5851. That is to say, a broad statutory scheme giving rights generally to all federal employees should not prevent enforcement of a provision quite specifically intended to remedy unlawful discrimination. Thus, it might be said that because section

5851(b)(2)(B) expressly states that the Secretary shall order reinstatement to a job, an employee should be reinstated without regard to whether such a right exists under the FECA; because the statute states that back pay and other forms of compensation can be awarded, they may be awarded; and if a deterrent effect flows naturally from execution of these statutorily authorized powers, so be it. But our analysis should hardly stop at this point, for it is not really possible in a case such as this to draw a line that would allow remedies under section 5851 and the FECA to coalesce.

■ Resort is proposed here to the FECA because of an objection to the Secretary's grant of administrative leave. Yet the FECA represents little or nothing more than a workmen's compensation act. *See, e.g., Avasthi v. United States,* 608 F.2d 1059 (5th Cir.1979); 20 C.F.R. § 10.150. One provision, 5 U.S.C. § 8151, does *refer* to reemployment rights, or "civil service retention rights" of employees, but it is arguable that a TVA employee cannot rely upon such rights. *See, e.g.,* 16 U.S.C. § 831b; 5 U.S.C. § 5596(c). However that may be, upon recognition that the FECA is primarily intended as a measure to provide compensation, we must also recognize that where FECA benefits are available they ordinarily constitute an employee's exclusive remedy. *See* 5 U.S.C. § 8116(c); *United States v. Demko,* 385 U.S. 149, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966). Thus we are confronted by the question whether DeFord should be required to seek compensation or any other type of relief solely under the FECA. This prospect, which arises despite clear language in section 5851 justifying full compensation for DeFord, most heavily influences our determination that a so-called hybrid remedy is inappropriate in this case. We conclude, after careful study, that relief fashioned wholly under section 5851 is appropriate here.

The FECA provides generally for compensation upon disability or death of employees due to "personal injury." 5 U.S.C. § 8102. To the extent that the term is potentially relevant here, the definition of an "injury" is more specifically limited to "injury by accident" or by "a disease proximately caused by the employment." 5 U.S.C. § 8101(5). It has been held that "[t]he type of injuries covered in 5 U.S.C. § 8101(5) ... does not appear to include such claims as ... for discrimination, mental distress, or loss of employment." *Sullivan v. United States,* 428 F.Supp. 79, 81 (E.D.Wis.1977). We are inclined to agree. Neither the language of the statute itself nor the policy foundations underlying workmen's compensation acts support a conclusion that intentional discrimination is to be viewed as causing an "injury" subject to FECA coverage. True it is that compensation acts are habitually given a liberal construction in order to effectuate their intended purposes, *e.g., United States v. Udy,* 381 F.2d 455, 456 (10th Cir.1967), but it should also be recognized that "[s]uch a rule of construction is for the benefit of the employee so that liberal coverage under the Act may be provided," *DeSousa v. Panama Canal Co.,* 202 F.Supp. 22, 25 (S.D.N.Y. 1962), and is not a device to be used for applying the FECA where it has no application or where stretching its application would be unjust, *id.* at 25; *accord,* 20 C.F.R. § 10.1(c).

Even if the FECA could be read such that it might otherwise apply to this case, DeFord should be allowed to make an election between alternative payments and benefits due him under administrative frameworks provided by Congress. Under a rather specific provision of the FECA:

An individual entitled to benefits under this subchapter because of his injury, or because of the death of an employee, who also is entitled to receive from the United States under a provision of statute other than this subchapter payments or benefits for that injury or death (except proceeds of an insurance policy), because of service by him (or in the case of death, by the deceased) as an employee or in the armed forces, shall elect which benefits he will receive. The individual shall make the election within 1 year after the injury or death or within a further time

allowed for good cause by the Secretary of Labor. The election when made is irrevocable, except as otherwise provided by statute.

5 U.S.C. § 8116(b). We do not question the principle that DeFord would not be allowed to maintain a civil action under the Federal Tort Claims Act or in tort at common law if the FECA is applicable, *see, e.g., Joyce v. United States,* 474 F.2d 215, 219 (3d Cir. 1973), but we are mindful of the key consideration that "an injured Federal employee must seek administrative relief before he files suit," *id.* at 219. *See also White v. TVA,* 58 F.Supp. 776 (E.D.Tenn.1945). If, indeed, the FECA potentially applies to this case at all then DeFord had two avenues by which, under the Secretary's supervision, he might obtain compensation in an administrative proceeding. He obviously made an election between the two and we are aware of no reason why he should not be allowed to do so, particularly in light of 5 U.S.C. § 8116(b).

Finally we might add that our conclusion regarding inapplicability of the FECA avoids, for reasons that spring from an entirely separate basis, the creation of what would certainly appear to be a paradoxical situation. Where a "substantial question" exists with respect to FECA coverage, Congress has left resolution of that question to the Secretary. *Avasthi, supra,* 608 F.2d at 1061; *Reep v. United States,* 557 F.2d 204, 207 (9th Cir.1977); *Joyce, supra,* 474 F.2d at 219. Moreover, the Secretary's decision is: "(1) final and conclusive for all purposes and with respect to all questions of law and fact; and (2) not subject to review by another official of the United States or by a court by mandamus or otherwise." 5 U.S.C. § 8128(b). *See, e.g., Waters v. United States,* 458 F.2d 20 (8th Cir.1972); *Soderman v. United States Civil Serv. Comm'n,* 313 F.2d 694 (9th Cir.1962), *cert. denied,* 372 U.S. 968, 83 S.Ct. 1089, 10 L.Ed.2d 131 (1963); *Blanc v. United States,* 244 F.2d 708 (2d Cir.), *cert. denied,* 355 U.S. 874, 78 S.Ct. 126, 2 L.Ed.2d 79 (1957). In the instant case the Secretary strenuously argues that the FECA has no application. It is difficult to see that either the interests of justice or the intent of Congress would be served should we require that DeFord pursue a claim under the FECA, when by statute the Secretary has been granted ultimate authority to deny coverage. Additional inquiry might be necessary in this area were we to rest our decision upon this premise, since the Secretary has delegated certain of his powers under the FECA such that his designees have authority "except as is otherwise provided by law," 20 C.F.R. § 10.2; but we need not venture further in light of our determination upon other grounds that no substantial question regarding FECA coverage is present here.

V.

In light of the foregoing, we hold that the Secretary's finding of unlawful discrimination is supported by substantial evidence. As to the matter of relief, DeFord should be awarded compensatory damages insofar as they are found to be appropriate, and he should receive reasonable attorneys' fees and costs, as provided by statute. Absent circumstances not disclosed in this record, he should be reinstated to his former job. The Secretary shall otherwise fashion appropriate relief, including restoration of all benefits and entitlements due DeFord. In conjunction with reinstatement, the compensation and damages provided for by statute should allow the formulation of a complete and proper remedy, without the creation of administrative leave or other novel benefits.

Accordingly, this case will be remanded to the Secretary for further proceedings consistent with this opinion.