960 F.2d 149
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
The DETROIT EDISON COMPANY, Petitioner,
v.
SECRETARY, UNITED STATES DEPARTMENT OF LABOR, Respondent,
Carolyn Larry, Intervenor.
 No. 91-3737.
 United States Court of Appeals, Sixth Circuit.
 April 17, 1992.
 
 Before NATHANIEL R. JONES, RALPH B. GUY, Jr. and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 The petitioner appeals the Secretary's determination that it violated the "whistleblower" protection provision of the Energy Reorganization Act, 42 U.S.C. § 5851, by demoting an employee after she reported alleged security violations to the Nuclear Regulatory Commission. Finding that the employee's complaint was timely and that the Secretary's decision was supported by substantial evidence, we affirm.
 
 I.
 
 2
 This petition arises out of an administrative complaint filed with the Department of Labor by the intervenor, Carolyn Larry, against the petitioner, The Detroit Edison Company. The complaint alleged that Detroit Edison had retaliated against Larry's protected activity, in violation of 42 U.S.C. § 5851, by demoting her after learning that she had reported security problems to the Nuclear Regulatory Commission (NRC). Although the facts in this dispute are contested, we shall summarize the evidence upon which an administrative law judge and the Secretary relied in finding for Larry.
 
 
 3
 In 1982, Detroit Edison hired Larry as a nuclear security officer at the company's Fermi 2 Nuclear Power Plant in Monroe, Michigan. As a nuclear security officer, Larry worked as a member of the plant's armed, uniformed security force.
 
 
 4
 In January 1984, Larry received a temporary promotion, not to exceed six months, to background investigator. Detroit Edison extended her promotion three times at six-month intervals. In September 1985, Larry's title was changed from background investigator to nuclear security specialist. In December 1985, Larry received a six-month extension as a nuclear security specialist, her fourth such extension. This last extension was to expire in June 1986. The background investigator and nuclear security specialist positions are non-uniformed and pay more than the nuclear security officer position.
 
 
 5
 According to Samuel Thompson, Larry's immediate supervisor, Larry's promotion was extended repeatedly because she performed very well. Thompson also recalled that, in the summer of 1985, Stu Leach, the plant's director of nuclear security, promised Larry a permanent position as a nuclear security specialist. According to Larry, Leach told her that he was waiting on the paperwork to make the appointment final. In the fall of 1985, Leach left his position and was replaced by L. Wayne Hastings. Larry testified that, after Hastings assumed Leach's position, Thompson assured her that Hastings was favorably impressed with her work and that the permanent appointment would be forthcoming soon.
 
 
 6
 In November 1985, Larry observed Cindy Cody, Hastings' secretary, using the Comprehensive Electronic Office computer system (CEO) as a word processor to prepare a "safeguards" report about a safety violation that had occurred at the plant. Two months earlier, at a meeting with Larry, Thompson, and Hastings, an NRC inspector had explained that the CEO was not secure for use with safeguards information. Larry discussed the matter with Cody, who told Larry that Hastings had ordered her to prepare the report on the CEO. Both Hastings and Thompson eventually learned of the conversation between Cody and Larry.
 
 
 7
 A few days later, Larry discussed the CEO incident with an NRC inspector. After telling Larry that he would look into the matter, the inspector questioned several other employees about the incident.
 
 
 8
 Hastings and Larry enjoyed a cordial professional and social relationship until November 1985.[1] Larry testified that the relationship became strained in late November after she reported the CEO incident to the NRC inspector.
 
 
 9
 The NRC sent Detroit Edison a copy of the inspector's report concerning the CEO incident in early February 1986. Larry disagreed with some of the report's findings, and sent NRC inspector Gary Pirtle a letter expressing her concerns on February 24, 1986.
 
 
 10
 Two weeks later, Pirtle returned to the plant. While in Hastings' office, Pirtle received a phone call from his supervisor at the NRC. Pirtle took the call at Cody's desk. Two security employees, Maxim Agge and James Bielaniec, testified that they overheard portions of Pirtle's conversation. Both testified that they heard Pirtle speak about Larry's letter to the NRC. Agge testified that he also overheard Pirtle mention something about a "safeguards inspection." Bielaniec was sitting approximately six feet from Cody's desk, while Agge was 10 to 15 feet away. Agge testified that he observed that Hastings was standing by his desk, approximately 15 feet away, during Pirtle's conversation. Hastings testified that he did not know that Larry had sent a letter to the NRC until this litigation began.
 
 
 11
 Larry testified that she became "completely invisible" to Hastings after she sent the letter. (App. 399). Agge testified that he noticed during this period that Hastings displayed a "lack of trust towards the staff members." (App. 497).
 
 
 12
 Two weeks later, Hastings met with James Piana, general director of nuclear operation services, and decided to reassign Larry and another employee, Keith Johnson, to nuclear security officer positions. Hastings and Piana testified that they made the reassignments as part of an enrichment program, in which uniformed officers received temporary promotions to non-uniformed positions.
 
 
 13
 According to Hastings and Piana, the decision was unrelated to any "whistleblowing" activity of Larry and Johnson.[2] Hastings testified that, although Larry's promotion had been re-extended until June, the extension periods were ceilings so that the promotion could be cancelled before the end of the period. Piana testified that "Mr. Hastings and I met and decided it was a good time to enact our plan to get rid of any--scratch that, please.... [To] bring people in from the Nuclear Security force itself, the uniform force, and give them this experience...." (App. 651).
 
 
 14
 Hastings and Piana made their decision while Thompson, Larry's immediate supervisor, was on vacation. When Thompson returned on April 1, 1986, he asked for time to argue against the reassignments. In a memo to Piana dated April 7, 1986, he expressed his belief that the reassignments would "seriously impair the security staff's ability to adequately implement the proactive compliance and evaluation program...." (App. 99). He explained that replacing Larry and Johnson with less experienced staff members would be "counter productive" to meeting security objectives, "not to mention the concerns the NRC may have." (App. 100). He concluded by recommending that Larry and Johnson retain their positions until at least the end of September 1986.
 
 
 15
 On April 9, 1986, Thompson verbally informed Larry that she would become a nuclear security officer as of April 25. Larry requested an explanation for the change, but Thompson provided none. Thompson showed Larry the memo he had written two days earlier. Larry began her new assignment as a uniformed security officer on April 27, 1986.
 
 
 16
 Pursuant to the Michigan Whistleblowers' Protection Act, Detroit Edison was required to post a notice informing employees of their rights under the statute. Mich.Comp.Laws Ann. § 15.368. Detroit Edison's posted notice advised employees to report violations to the company's Equal Employment Opportunity (EEO) Division.
 
 
 17
 On April 10, the day after Thompson informed Larry of her imminent reassignment, Larry visited Detroit Edison's EEO office in Detroit and spoke with EEO Specialist Denise O'Keefe. Larry expressed doubts to O'Keefe about whether she was in the right place or whether she should file a complaint with a federal or state agency. O'Keefe testified that she assured Larry that she was in the right place, but that her efforts on Larry's behalf would cease if Larry filed a formal complaint. O'Keefe did not tell Larry that she represented the interests of Detroit Edison in employment discrimination and whistleblower cases. O'Keefe also testified that Larry was concerned about missing a 30-day deadline for filing a complaint with the Department of Labor and that she was unsure when the 30 days began to run. O'Keefe did not inform Larry when the period began to run.
 
 
 18
 After O'Keefe assured Larry that she would keep any disclosures in confidence, Larry explained her complaint to her. O'Keefe promised to investigate. A few days later, Larry provided O'Keefe with documents supporting her complaint. After a few weeks, Larry began calling O'Keefe frequently to determine how the investigation was proceeding. O'Keefe testified that she tried unsuccessfully to schedule a meeting with Piana and that she discussed the matter with a member of Detroit Edison's legal staff. She took no other action on Larry's behalf. She also stopped returning Larry's phone calls.
 
 
 19
 Larry filed her complaint with the Department of Labor on May 19, 1986. In her handwritten complaint, Larry explained that she had hoped to obtain relief through O'Keefe but had decided to file because "the 30 day time limit mentioned in the NRC's 'Notice to Employees' is fast approaching and I have not received any assistance from Detroit Edison's EEO person." (App. 90). O'Keefe turned over Larry's documentation to Detroit Edison's legal department after learning that Larry had filed a formal complaint.
 
 
 20
 A hearing was held before an administrative law judge in July 1986. After summarizing the testimony and documents presented by the parties, the ALJ first concluded that Larry's complaint was timely because Thompson's verbal notice of the reassignment was not unequivocal. After finding that Larry had established a prima facie case of retaliation, the ALJ found that Larry had shown that Detroit Edison's explanations were pretextual. Specifically, the ALJ found evidence of retaliatory animus against whistleblowers in the testimony of both Piana and Hastings and in the timing of Larry's reassignment. The ALJ found "less than credible" Hastings' testimony that he was unaware of Larry's communications to the NRC. (App. 36).
 
 
 21
 Accordingly, the ALJ ordered Detroit Edison to reassign Larry to a nuclear security specialist position. The order left open the question as to whether the assignment would be permanent.
 
 
 22
 The Secretary upheld the ALJ's decision in July 1991.[3] The Secretary affirmed the ALJ's determination that Larry's complaint was timely because Thompson's notice was not unequivocal. Alternatively, the Secretary found that the 30-day period was equitably tolled by O'Keefe's "misleading and confusing" conduct which distracted Larry from filing her complaint earlier. (App. 26). The Secretary ordered Detroit Edison to reinstate Larry as a nuclear security specialist on a permanent basis, finding from Thompson's and Larry's testimony that she would have received a permanent promotion but for Detroit Edison's retaliation. Detroit Edison then filed this petition for review of the Secretary's order.
 
 II.
 
 23
 Detroit Edison first argues that the Secretary erred in finding that Larry's complaint was timely. The "whistleblower" protection provision of the Energy Reorganization Act provides:
 
 
 24
 Any employee who believes that he has been discharged or otherwise discriminated against by any person in violation of subsection (a) of this section may, within thirty days after such violation occurs, file ... a complaint with the Secretary of Labor....
 
 
 25
 42 U.S.C. § 5851(b)(1) (emphasis added). Thompson informed Larry of her imminent reassignment on April 9, 1986. However, Larry did not return to uniform until April 27. Larry filed her complaint with the Department of Labor on May 19.
 
 
 26
 The Secretary concluded that Larry's complaint was timely because Larry did not receive unequivocal and final notice of her reassignment until she actually returned to the uniformed position and because Detroit Edison's conduct equitably tolled the limitations period.
 
 
 27
 When reviewing these two conclusions, we must accept the Secretary's determination of the underlying facts if supported by substantial evidence. Moon v. Transport Drivers, Inc., 836 F.2d 226, 229 (6th Cir.1987). Evidence is substantial if a reasonable mind could accept it as adequate to support a conclusion. Id. Since the applicability of a limitations period to a given set of facts is a question of law, we review the Secretary's application of the limitations period de novo. See Rose v. Dole, 945 F.2d 1331, 1334 (6th Cir.1991).
 
 A.
 
 28
 The Secretary and Larry first argue that Larry filed her complaint within 30 days of the alleged violation. The date the employee receives notice of the adverse employment decision, not the date the consequences are first felt, marks the beginning of the 30-day period. English v. Whitfield, 858 F.2d 957, 961 (4th Cir.1988); see also Delaware State College v. Ricks, 449 U.S. 250, 258 (1980) (reaching same result based on similar limitation provision in Title VII). However, to start the clock running, the notice must be unequivocal and final. English, 858 F.2d at 961.
 
 
 29
 The ALJ concluded that the 30 days did not begin to run on April 9 because Thompson's verbal notice did not set forth the specifics of the transfer. The Secretary reached the same conclusion, adding that Thompson's memo opposing the reassignment may have led Larry to believe that the decision was reversible.
 
 
 30
 Detroit Edison argues that Thompson's notice was unequivocal and final. Detroit Edison points to Larry's testimony, in which she acknowledged that she understood from Thompson that the decision was final, and to her complaint to the Department of Labor in which she wrote: "On 4-9-86 Sam Thompson, my immediate supervisor, informed me I was going back to uniform as [sic] nuclear security officer. He said he wrote a memo trying to prevent this but was unsuccessful." (App. 94).
 
 
 31
 The Secretary and Larry do not point to any evidence that would support the Secretary's conclusion that Thompson's notice to Larry was equivocal or open to modification. Since the only evidence in the record indicates that the notice was unequivocal and final, we find that the Secretary's conclusion was not supported by substantial evidence.
 
 B.
 
 32
 The Secretary and Larry argue that Larry's complaint was nevertheless timely because of equitable tolling. The doctrine of equitable tolling applies when an employee misses a filing deadline because of "misleading conduct by the employer or ineffective but diligent conduct by the employee." Andrews v. Orr, 851 F.2d 146, 150 (6th Cir.1988).
 
 
 33
 In Andrews, we discussed in some detail the two types of circumstances that would justify equitable tolling. First, tolling is appropriate if the employer engaged in affirmative conduct that caused the employee to miss the deadline. Id., 851 F.2d at 151. Second, even in the absence of misleading employer conduct, equitable tolling may be appropriate if the employee missed the deadline despite reasonable efforts to comply. In Andrews, we identified five factors to consider in such cases:
 
 
 34
 (1) lack of actual notice of filing requirement; (2) lack of constructive knowledge of filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the notice requirement.
 
 
 35
 851 F.2d at 151.
 
 
 36
 The Secretary found that misleading conduct by Detroit Edison caused Larry to delay filing her complaint. We find that this factual conclusion is supported by substantial evidence.
 
 
 37
 Larry and O'Keefe both testified that Larry indicated on April 10 that she would immediately file her complaint unless O'Keefe assured her that she had come to the "right place" to resolve her dispute. O'Keefe told Larry that she had come to the right place, but that all efforts on Larry's behalf would cease if Larry filed a complaint. This evidence amply supports the conclusion that O'Keefe's assurances caused Larry to delay filing her claim.
 
 
 38
 However, Detroit Edison denies that its conduct was misleading. The Secretary found that Detroit Edison's representations to Larry were deceptive in several material ways. First, O'Keefe admitted that she never explained to Larry that she represented the interests of Detroit Edison. Larry's testimony supports the finding that, although Larry knew O'Keefe worked in Detroit Edison's EEO office, Larry did not know that O'Keefe represented Detroit Edison in employment discrimination and retaliation cases.
 
 
 39
 Second, O'Keefe assured Larry that she would keep any disclosures in confidence. In fact, O'Keefe admitted that she discussed Larry's case with Detroit Edison's legal department, and O'Keefe turned over Larry's documents to the legal department after O'Keefe filed her complaint.[4]
 
 
 40
 Third, O'Keefe promised to pursue Larry's grievance. However, O'Keefe made almost no discernible progress in the four weeks after Larry contacted her. O'Keefe did not discuss the matter with Piana or Hastings, and she failed to return numerous phone calls from Larry.
 
 
 41
 Fourth, O'Keefe testified that she was aware that Larry was confused as to when the 30-day limitation period began to run. However, despite discussing Larry's case with Detroit Edison's legal department, O'Keefe did not attempt to clear up Larry's confusion.
 
 
 42
 These facts are sufficient to support the Secretary's conclusion that Detroit Edison's conduct caused Larry to delay her filing. From the outset, Larry made it clear that she would file immediately unless O'Keefe could provide her satisfaction. The evidence amply supports the finding that O'Keefe misled Larry by concealing her role as a representative of Detroit Edison's interests, by making false promises to keep Larry's disclosures in confidence and to pursue the matter diligently, and by allowing Larry to labor under a confusion as to the proper timing of a complaint. The Secretary could reasonably conclude, as she did, that Larry would not have attempted to resolve the matter internally had O'Keefe not misled her.
 
 
 43
 Accordingly, we find that substantial evidence supports the Secretary's determination that Detroit Edison's conduct caused Larry to delay her filing. Since that factual determination is sufficient to support equitable tolling, we affirm the Secretary's decision to equitably toll the limitations period.
 
 III.
 
 44
 Detroit Edison next argues that the Secretary erred in finding that it demoted Larry because of her protected whistleblowing activity. The parties agree that retaliatory discharge claims are governed by a modified version of the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The employee bears the burden of establishing the three elements of a prima facie case: (1) that he or she engaged in activity protected by the Energy Reorganization Act; (2) that he or she was subjected to adverse employment action; and (3) that the adverse employment action was caused by the protected activity. See Moon, 836 F.2d at 229 (setting forth elements of prima facie whistleblower retaliation case under Surface Transportation Assistance Act).
 
 
 45
 If the employee establishes a prima facie case, the burden of production then shifts to the employer to articulate a legitimate reason for the adverse employment action. Moon, 836 F.2d at 229. If the employer meets that burden, the employee bears the ultimate burden to prove that the articulated reason is pretextual. Id.
 
 
 46
 The Secretary found that Larry had established a prima facie case of retaliatory employment action and that Detroit Edison's articulated reason for the action was pretextual. Detroit Edison challenges both halves of the Secretary's finding. Our review is limited to determining whether the Secretary's findings are supported by substantial evidence. Id. In making that determination, we "may not relitigate the case de novo, resolve conflicts in evidence, or decide questions of credibility." Id.
 
 
 47
 Detroit Edison does not deny that Larry engaged in protected activity by expressing her concerns to the NRC about Hastings' use of the CEO system. There is also no real dispute that Larry's loss of her promotion to nuclear security specialist constituted an adverse employment action. However, Detroit Edison does dispute the Secretary's finding that there was a causal link between the protected activity and the adverse action.
 
 
 48
 We find substantial evidence to support the Secretary's finding that Larry met her burden of establishing a causal link. In Part I of this opinion, we summarized the evidence produced before the ALJ in some detail. That evidence tends to demonstrate (1) that Larry had performed very well in her assignment as a nuclear security specialist and had been promised a permanent promotion; (2) that her relationship with Hastings began to deteriorate shortly after she alerted an NRC inspector to Hastings' misuse of the CEO system, and that the relationship worsened further after she wrote a letter to the NRC in February 1986; (3) that Hastings and Piana decided to rescind her promotion two weeks after NRC Inspector Pirtle disclosed Larry's whistleblowing while speaking on the phone a few yards from where Hastings was standing; and (4) that Hastings and Piana made the decision while Thompson, Larry's supervisor, was on vacation and implemented the decision over Thompson's vigorous objection.
 
 
 49
 This evidence produced by Larry is clearly sufficient to establish a prima facie case of retaliatory discharge. The testimony of Hastings and Piana strengthened Larry's case even further. Hastings admitted that he "didn't want any employee to be unduly helpful" to the NRC. (App. 299). This testimony was consistent with Larry's testimony that Hastings had displayed hostility toward the NRC. Piana's testimony that Larry and Johnson were demoted because "it was a good time to enact our plan to get rid of any--" also suggests retaliatory animus. (App. 651).
 
 
 50
 Detroit Edison takes issue with much of this evidence. For example, Detroit Edison points out that Hastings denied overhearing Pirtle's phone conversation. However, issues of credibility are for the ALJ. The ALJ chose not to credit Hastings' testimony. Since there is substantial evidence supporting a finding that Hastings could hear Pirtle's conversation, we may not overturn the ALJ's credibility determination.
 
 
 51
 As we have indicated, the ALJ and the Secretary relied on substantial evidence to find that Larry established a prima facie case of retaliatory action. We therefore affirm that finding.
 
 
 52
 We now turn to Detroit Edison's articulated reason for Larry's demotion. Hastings and Piana testified that they reassigned Larry and Johnson so that other nuclear security officers could receive temporary promotions. There is no dispute that this explanation would serve as a legitimate reason for the employment action.
 
 
 53
 However, the ALJ and the Secretary found that Larry had established that Detroit Edison's articulated reason was pretextual. Detroit Edison now challenges this finding. Larry and the Secretary point to several pieces of evidence that support the finding of pretext.
 
 
 54
 First, Larry and the Secretary point to the timing of the decision. Piana and Hastings decided to act only two weeks after Pirtle's phone call. Temporal proximity is a highly probative factor in retaliatory action cases. See Couty v. Dole, 886 F.2d 147, 148 (8th Cir.1989); Moon, 836 F.2d at 229.
 
 
 55
 Second, Larry and the Secretary point to the fact that Detroit Edison rescinded Larry's promotion several months before it would have expired. Hastings testified that the six-month temporary promotion term was only a ceiling so that a promotion could be rescinded before the end of the term. However, the ALJ did not credit Hastings' explanation, and Detroit Edison did not present any evidence that it had terminated the temporary promotions of other employees before the end of their terms. Thompson testified that the normal practice was to wait until the end of the term before rescinding a temporary promotion. The failure to follow normal procedure is evidence of retaliation. See DeFord v. Secretary of Labor, 700 F.2d 281, 287 (6th Cir.1983).[5]
 
 
 56
 Third, Hastings and Piana acted while Thompson was on vacation and implemented their decision over his strenuous dissent. Thompson's memo explaining how the move would undermine security is evidence from which a factfinder could infer that Detroit Edison did not make the decision for legitimate business reasons.
 
 
 57
 Fourth, the testimony of Hastings and Piana tends to support a finding of pretext. The ALJ found evidence of animus toward whistleblowers in the testimony of both men. We again stress that such credibility determinations are the province of the ALJ.
 
 
 58
 We find that the ALJ and the Secretary relied on substantial evidence to find that Detroit Edison's articulated reason for Larry's reassignment was pretextual. We therefore affirm the Secretary's finding that Detroit Edison unlawfully retaliated against Larry because of her protected whistleblowing activity, in violation of 42 U.S.C. § 5851.
 
 IV.
 
 59
 Having affirmed the Secretary's finding of liability, we now turn to the remedy. The Secretary ordered Detroit Edison to return Larry to the position of nuclear security specialist on a permanent basis. Detroit Edison argues that the Secretary exceeded her powers because Larry only held the nuclear security specialist position on a temporary basis.
 
 
 60
 Upon a finding of retaliatory action against a whistleblower, the Secretary is authorized to order the employer to "reinstate the complainant to his former position together with the compensation (including back pay), terms, conditions, and privileges of his employment." 42 U.S.C. § 5851(b)(2)(B)(ii). At the time of the violation, Larry held a temporary appointment as a nuclear security specialist. Therefore, Detroit Edison contends that, at most, the Secretary could order it to reinstate Larry on a temporary basis.
 
 
 61
 Detroit Edison's argument overlooks the Secretary's finding that Larry had been promised the nuclear security specialist position on a permanent basis. That finding was supported by substantial evidence, specifically the testimony of Larry and Thompson, her supervisor.
 
 
 62
 A promise of permanent employment at a certain level is an example of the types of "terms, conditions, and privileges" that may attach to a position. Therefore, the Secretary's order was consistent with her authority to return Larry to the position she occupied at the time of the violation. Anything less would allow Detroit Edison to once again remove Larry's promotion and would not make Larry whole. Therefore, we affirm the Secretary's order to Detroit Edison to reinstate Larry as a nuclear security specialist on a permanent basis.
 
 
 63
 Accordingly, the decision of the Secretary is AFFIRMED.
 
 
 
 [1]
 In fact, at Hastings' invitation, Larry accompanied him to a company party
 
 
 [2]
 In an internal grievance proceeding, Johnson alleged that he was reassigned because he had spoken out about safety and management concerns to a safety investigation team managed by a Detroit Edison subsidiary
 
 
 [3]
 The record is unclear as to why five years elapsed between the ALJ's decision and the Secretary's review
 
 
 [4]
 Detroit Edison strenuously argues that any actions by O'Keefe that occurred after Larry filed her complaint are irrelevant to determine whether Larry was misled. We find this contention to be meritless. If O'Keefe had told Larry on April 10 that she would disclose Larry's confidences to Detroit Edison's legal department, Larry almost certainly would not have delayed filing her complaint. Therefore, O'Keefe's broken promise of confidentiality was relevant misleading conduct regardless of when she actually broke the promise
 
 
 [5]
 Detroit Edison relies heavily on the testimony of Joseph Bernadotte, who, after a temporary promotion to nuclear security specialist, was returned to the rank of nuclear security officer a few months before Larry's promotion was rescinded. Detroit Edison presents no evidence, however, that Bernadotte was reassigned during the middle of his promotion term