**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WALTER L. TAMOSAITIS, PH.D., an individual, *Plaintiff-Appellant*, v. URS INC., a Delaware corporation; URS ENERGY AND CONSTRUCTION INC., an Ohio corporation; U.S. DEPARTMENT OF ENERGY; URS CORPORATION, *Defendants-Appellees*. | No. 12-35924 D.C. No. 2:11-cv-05157-LRS ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Lonny R. Suko, District Judge, Presiding

Argued and Submitted
November 7, 2013—Seattle, Washington

Filed November 7, 2014
Amended March 4, 2015

Before: Alex Kozinski, Chief Judge, and Richard A. Paez
and Marsha S. Berzon, Circuit Judges.

Order;
Opinion by Judge Berzon

# SUMMARY[*]

## Whistleblower / Energy Reorganization Act

The panel affirmed the district court's dismissal of the U.S. Department of Energy from the suit, affirmed the grant of summary judgment in URS Corp.'s favor, and reversed the grant of summary judgment for URS Energy & Construction, Inc. in an action brought by a URS Energy employee alleging violations of the Energy Reorganization Act whistleblower protection provision, concerning cleanup efforts of nuclear waste at the Hanford Nuclear Site in Washington state.

The "opt-out" provision of the Energy Reorganization Act ("ERA"), 42 U.S.C. § 5851(b)(4), empowers whistleblowing employees at nuclear energy sites to bring anti-retaliation claims to federal court after one year of agency inaction. The Department of Energy ("DOE") led the effort to clean up the pollution at Hanford, which included construction and management of a Waste Treatment Plant. The Department contracted with Bechtel National, Inc., which subcontracted with URS Energy & Construction, Inc. ("URS Energy") for work on the project. URS Energy is a wholly-owned subsidiary of URS Corporation.

Addressing the issue of administrative exhaustion, the panel held that before an employee may opt out of the agency process and bring a retaliation suit against a respondent in federal court, the respondent must have had notice of, and an opportunity to participate in, the agency action for one year.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel affirmed the dismissal of DOE because there was no administrative complaint pending against DOE for one year before the employee filed suit against DOE in federal court, and § 5851(b)(4)'s administrative exhaustion requirement was not satisfied as against DOE. The panel held that administrative exhaustion was sufficient as to URS Energy where the employee gave adequate notice to URS Energy that it was the named respondent to his complaint. Finally, the panel affirmed the district court's dismissal of URS Corp. for lack of administrative exhaustion where URS Corp. was not adequately named in the employee's original administrative complaint.

The panel held that the employee introduced sufficient evidence to create a triable issue as to whether his whistleblowing activity was a contributing factor in the adverse employment action URS Energy took against him. The panel also held that there was a genuine issue of fact as to whether the employee's compensation, terms, conditions, or privileges of employment were affected by his transfer to another position. Accordingly, the panel reversed the grant of summary judgment to URS Energy for ERA whistleblower retaliation.

The panel held that the employee did not have a statutory jury trial right for his ERA whistleblower suit. The panel held that the employee did have a constitutional right to a jury trial for his claims seeking money damages under § 5851(b)(4), and reversed. The panel remanded for further proceedings.

**COUNSEL**

John Sheridan (argued), Sheridan Law Firm, Seattle, Washington; and Joseph R. Shaeffer, MacDonald Hoague & Bayless, Seattle, Washington, for Plaintiff-Appellant.

Katherine Bushman Smith (argued), Trial Attorney, Office of the General Counsel, United States Department of Energy, Washington, D.C.; and Rolf Harry Tangvald, Assistant United States Attorney, Office of the United States Attorney, Spokane, Washington, for Defendant-Appellee Department of Energy.

Matthew William Daley (argued), Timothy Michael Lawlor, and Matthew A. Mensik, Witherspoon Kelley, Spokane, Washington, for Defendants-Appellees URS Corporation, URS Inc., and URS Energy and Construction, Inc.

## ORDER

The panel has voted to amend its opinion filed November 7, 2014, and published at 771 F.3d 539, and to deny appellees URS Corporation, URS Energy and Construction Inc., and URS Inc.'s petition for rehearing and petition for rehearing en banc with the following amendments:

On page 551, change <URS E&C stipulated in the district court that> to <URS E&C assumed, for purposes of its summary judgment motion, that>.

On page 557, note 9, change <the majority of state courts> to <some state courts>.

The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing is denied and the petition for rehearing en banc is rejected. No further petitions for rehearing or rehearing en banc will be entertained. The mandate shall issue in due course.

## OPINION

BERZON, Circuit Judge:

The Energy Reorganization Act ("ERA"), 42 U.S.C. § 5851(b)(4), includes an "opt-out" provision empowering whistleblowing employees working at nuclear energy sites to bring anti-retaliation claims to federal court after one year of agency inaction. Our case concerns the interpretation and application of that provision. In addition, we consider whether a whistleblower who sues an employer in a federal anti-retaliation lawsuit under the ERA opt-out provision has a constitutional right to a jury trial.

## I.

### A.  Background

The Hanford Nuclear Site is a former nuclear weapons production facility in Washington state.[1] Hanford's reactors produced plutonium for the national defense for over forty years. The Hanford site abuts a river and stores fifty-three million gallons of hazardous, high-level nuclear waste in underground tanks. There are estimates that one million gallons of nuclear waste have leaked from the storage tanks into the ground and that the groundwater beneath eighty-five square miles of the site is polluted.

---

[1] This appeal requires us to consider the district court's rulings at both the motion to dismiss and summary judgment stage. We rely on the allegations in the first amended complaint for our account of this appeal's background but turn to the evidentiary record when analyzing the summary judgment rulings.

The Department of Energy ("DOE") leads the effort to clean up the pollution at Hanford. The clean-up plan includes construction and management of a Waste Treatment Plant ("WTP") responsible for "separating and vitrifying (immobilizing in glass) . . . nuclear tank waste." Vitrification involves mixing nuclear waste with glass-forming materials at extremely high temperatures, then pouring the mixture into stainless steel containers to cool and solidify it. Once immobilized in glass, the nuclear waste generally is considered stable and safe for storage. Over hundreds of years, the waste will lose its radioactivity.

The building of the WTP is in process. When completed, the WTP will be the largest such facility in the world. The WTP is to have a "design life of forty years," meaning that some of its parts are to operate without maintenance for four decades. The sound design of the WTP is important to protect against occurrence of a "criticality accident" — a nuclear chain reaction inside plutonium or enriched uranium. Such reactions release radiation, which, particularly in combination with hydrogen gas, could be catastrophic.

To assist in its clean-up effort at Hanford, DOE contracts with Bechtel National, Inc. ("Bechtel"). Bechtel subcontracts with URS Energy & Construction, Inc., ("URS E&C") for work on the WTP.

In the wake of a report detailing problems with the Hanford clean-up, appellant Dr. Walter Tamosaitis, an employee of URS E&C, was appointed to lead a study reviewing technical challenges within the WTP project. The study identified twenty-eight technical issues, twenty-seven of which were "closed," meaning resolved, by the planned date of October 2009. The remaining issue, termed the "M3

mixing issue," required solving a design problem concerning the mixing of nuclear waste in certain of the WTP pretreatment tanks.

The M3 mixing issue proved to be a lingering and complex challenge. Tamosaitis wanted to extend the deadline for solving the issue to September 2010, while Bechtel wanted it resolved by June 2010. Failure to resolve the M3 mixing issue by June would have jeopardized Bechtel's six-million-dollar fee.

Bechtel rejected Tamosaitis's advice and announced closure of the M3 mixing issue by June. Tamosaitis objected: He brought a fifty-point list of environmental and safety concerns to a meeting hosted by Bechtel; forwarded the same list to Bill Gay, a URS employee and WTP Assistant Project Manager; and reached out to several WTP consultants by email, hoping that they would oppose closure and publicize his concerns.

Two days later, Tamosaitis was fired from the WTP project. URS Operations Manager Dennis Hayes personally terminated Tamosaitis. Hayes directed Tamosaitis to return his badge, cell phone, and Blackberry, and leave the site immediately. Tamosaitis was reassigned, in a non-supervisory role, to a basement office in a URS facility off the Hanford site. He was later offered other positions with URS, but they required relocation.

## B. The ERA Anti-Retaliation Provision

The anti-retaliation — or "whistleblower" protection — provision of the ERA provides that:

> No employer may discharge any employee or
> otherwise discriminate against any employee
> with respect to his compensation, terms,
> conditions, or privileges of employment
> because the employee . . . notified his
> employer of an alleged violation of this
> chapter [Development of Energy Sources] or
> the Atomic Energy Act of 1954.

42 U.S.C. § 5851(a)(1)(A). This statute "protect[s] workers
from retaliation based on their concerns for safety and
quality," *Mackowiak v. Univ. Nuclear Sys., Inc.*, 735 F.2d
1159, 1163 (9th Cir. 1984), and ensures that the government
agencies charged with monitoring nuclear safety do not see
their "channels of information . . . dried up by employer
intimidation," *DeFord v. Sec'y of Labor*, 700 F.2d 281, 286
(6th Cir. 1983) (quoting *NLRB v. Scrivener*, 405 U.S. 117,
122 (1972)).

The Department of Labor, Occupational Safety and
Health Administration ("DOL-OSHA") implements this anti-
retaliation provision. *See* 29 C.F.R. §§ 24.100–24.105. An
employee seeking redress under section 5851 must file a
complaint with DOL-OSHA and follow the statutorily
designated administrative scheme, whereby:

> Any employee who believes that he has been
> discharged or otherwise discriminated against
> by any person in violation of subsection (a) of
> this section may, within 180 days after such
> violation occurs, file (or have any person file
> on his behalf) a complaint with the Secretary
> of Labor (in this section referred to as the
> "Secretary") alleging such discharge or

discrimination.    Upon receipt of such a
complaint, the Secretary shall notify the
person named in the complaint of the filing of
the complaint, the Commission, and the
Department of Energy.

42 U.S.C. § 5851(b)(1).

In 2005, Congress bolstered this whistleblower protection
by amending section 5851 to allow employees to take their
retaliation cases to federal district court if, after one year,
DOL-OSHA has not adjudicated their claim.  Energy Policy
Act of 2005, Pub. L. No. 109-58, § 629, 119 Stat 594 (Aug.
8, 2005).  The amendment adds the "opt-out" clause at issue
here, which provides:

If the Secretary has not issued a final decision
within 1 year after the filing of a complaint
. . . and there is no showing that such delay is
due to the bad faith of the person seeking
relief under this paragraph, such person may
bring an action at law or equity for de novo
review in the appropriate district court of the
United States, which shall have jurisdiction
over such an action without regard to the
amount in controversy.

42 U.S.C. § 5851(b)(4).    Congress added the opt-out
provision to the statutory scheme to address "extensive delays
that . . . frustrated the purpose of [the] whistleblower
statutes."  H.R. Rep. No. 108-65, at 160 (2003).

## C.  Procedural Background

On July 30, 2010, Tamosaitis filed a discrimination action with DOL-OSHA.  He named "his employer, URS, Inc., a contractor at the Hanford Nuclear Site," as respondent, and asserted workplace discrimination on account of activities protected under the ERA.  DOL-OSHA acknowledged receipt of the complaint on August 13, 2010, and said it was "providing the named party with a copy of [the] complaint and information concerning OSHA's responsibilities under the law."

URS Corporation ("URS Corp.") responded to Tamosaitis's OSHA complaint by filing a position statement with DOL-OSHA.  On the second page of the document, URS Corp. stated that "Mr. Tamosaitis' employer is URS Energy & Construction, Inc., a wholly-owned subsidiary of URS Corporation. . . .  As URS Energy & Construction, Inc. employs Mr. Tamosaitis and is the party to the Subcontract, references to URS in the remainder of this initial statement of position are to URS Energy & Construction, and not URS Corporation."  The eighteen-page position statement went on to defend against Tamosaitis's claims on the merits.

Tamosaitis amended the OSHA complaint twice: On December 15, 2010, he added DOE and Bechtel as defendants, and on September 7, 2011, he deleted Bechtel because he was pursuing Bechtel in state court, and changed the employer defendant from URS, Inc. to URS Corp. and URS E&C.  That same day, Tamosaitis gave notice that he intended to bring an action in federal court pursuant to the ERA's opt-out provision.  In response to Tamosaitis's notice of intent, DOL-OSHA dismissed the agency complaint.

Tamosaitis filed his complaint in federal court on November 9, 2011, and his first amended complaint on December 20, 2011. The suit names URS Corp., URS E&C, and DOE as defendants, and alleges violations of the ERA whistleblower protection provision, 42 U.S.C. § 5851. Tamosaitis also requested a jury trial.

The district court granted DOE's motion to dismiss, ruling that Tamosaitis did not wait a full year after naming DOE in his agency complaint and so did not exhaust his administrative remedies against DOE.[2] As to URS Corp. and URS E&C, the district court granted summary judgment, also for lack of administrative exhaustion, reasoning that Tamosaitis was required to wait one year after changing the named defendant from URS Inc. to URS Corp. and URS E&C before filing suit in federal court. In addition, summary judgment was granted to URS Corp. on the alternative ground that Tamosaitis offered no evidence tending to show that URS Corp. was anything but a parent corporation of Tamosaitis's employer, URS E&C, and that this parent-subsidiary relationship was insufficient to establish liability under the ERA. In a separate order, the district court granted the URS defendants' motion to strike Tamosaitis's jury demand, ruling that Tamosaitis had no statutory or constitutional right to a trial by jury.

---

[2] As alternative grounds for dismissing DOE from the suit, the district court found that: (1) DOE did not qualify as an employer under the ERA's whistleblower protection provision; and (2) the complaint failed to state a claim against DOE for which relief could be granted, because the court lacked the power to order DOE to provide the equitable relief Tamosaitis requested.

Finally, with regard to URS E&C, the district court held, alternatively, that there was no genuine issue of material fact as to whether URS E&C "took adverse action because of [Tamosaitis's] conduct." All the evidence, the district court ruled, showed that Bechtel, not URS E&C, "was solely responsible for [Tamosaitis's] removal from the WTP project and is the entity which 'took adverse action' against him." In addition, the court concluded that, although Tamosaitis was taken off the WTP project at Hanford, he was not fired from URS E&C, and "[n]othing in the record create[d] a genuine issue of material fact that URS E&C has discriminated [against him] with respect to his compensation, terms, conditions, or privileges of employment in violation of the ERA."

Tamosaitis timely appealed the partial dismissal, the denial of jury trial, and the grant of summary judgment.

## II.

### A.  Administrative Exhaustion

**(1)**    The district court ruled that the ERA opt-out provision requires employees to wait one full year after naming a particular respondent in a DOL-OSHA complaint before bringing a federal suit against that respondent. Thus, concluded the court, because Tamosaitis did not wait until December 15, 2011, to sue DOE and until September 7, 2012, to sue URS Corp. and URS E&C, he did not exhaust his

administrative remedies against these defendants before filing suit and may not proceed in federal court.[3]

We agree that, as a general rule, adding a new respondent to an administrative complaint restarts the one-year exhaustion clock as to that person. As we later explain, that conclusion leads us to affirm the district court's dismissal of two of the appellees in this case, DOE and URS Corp., but not the third, URS E&C.

First, the structure of section 5851 indicates that the administrative exhaustion period is linked to a particular respondent, not to the substance of the claim alone: Section 5851 provides that the Secretary of Labor is to "notify *the person named in the complaint* of the filing of the complaint," 42 U.S.C. § 5851(b)(1) (emphasis added); investigate the "violation alleged in the complaint[,]" and "notify . . . *the person alleged to have committed such violation* of the results of the investigation," 42 U.S.C. § 5851(b)(2)(A) (emphasis added); and, where appropriate, enter a settlement "with *the person* alleged to have committed [the] violation," *id.* (emphasis added). Knowing the identity of the respondent is thus a critical component of carrying out the prescribed procedure within the agency.

Second, like the statute, DOL-OSHA regulations assume that every ERA whistleblower administrative complaint will name a particular respondent or respondents, and that the named individuals will have an opportunity to participate

---

[3] Whether the one-year exhaustion requirement is terminated by the filing of the notice of intent to remove to federal district court or by the date of filing of the complaint in federal district court makes no difference in this case. We therefore do not address this question.

throughout the agency's adjudicative process. The regulations provide that "the Assistant Secretary will notify the respondent of the filing of the complaint," 29 C.F.R. § 24.104(a); that "the respondent may submit to the Assistant Secretary a written statement and any affidavits or documents substantiating its position," 29 C.F.R. § 24.104(b); and that the agency "will provide to the complainant . . . a copy of all of respondent's submissions to the agency," 29 U.S.C. § 24.104(c). The agency regulations define "respondent" as "the employer named in the complaint, who is alleged to have violated" the anti-retaliation statute. 29 C.F.R. § 24.101. Unless such a respondent is "named in the complaint," *id*., that individual or entity may not have the benefit of notice or the opportunity to participate in the agency's complaint review process, and the agency may not have occasion to consider that respondent's submission of position.

Third, although the opt-out provision speaks in general terms and makes no specific mention of respondents, defendants, or employers, that provision contemplates a basic level of similarity between an agency action and the corresponding federal suit. The opt-out clause provides that after one year of agency inaction the employee "may bring an action . . . for de novo review." 42 U.S.C. § 5851(b)(4). "[D]e novo review" is a term of art that, in the administrative context, generally refers to "[a] court's nondeferential review of an administrative decision, usu[ally] through a review of the administrative record plus any additional evidence the parties present." Black's Law Dictionary (9th ed. 2009). "[D]e novo review" of an agency action for which there is no final agency decision, as will inevitably be the case in actions under section 5851(b)(4), differs in important ways from judicial review of a final agency decision. *See Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 246–47 (4th Cir.

2009).  Still, Congress's characterization of the opt-out action as *review* of the agency proceedings indicates that the district court litigation is tied to the case and the parties that were before the agency.

Finally, allowing an employee to sue a defendant who was not a respondent in the administrative proceedings for a full year before the case was moved to federal court would severely undermine the efficacy of the administrative exhaustion scheme.

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*Weinberger v. Salfi*, 422 U.S. 749, 765 (1975).  If there were no requirement of parity between the respondents in an agency action under the ERA and the defendants named in a corresponding ERA whistleblower federal lawsuit, an employee could file a DOL-OSHA complaint, add an entirely new respondent a year later, and — even if neither the new respondent nor the agency had notice of the new respondent's involvement in the retaliation — proceed to federal court against the new respondent the very next day.  By doing so, the employee would effectively make it impossible for the

agency to investigate the allegations against the new respondent and create a record concerning that respondent.[4]

A primary purpose of the opt-out provision is to encourage DOL-OSHA to resolve whistleblower claims promptly. We cannot expect DOL-OSHA to resolve claims against unknown respondents who have no opportunity to participate in the administrative process. Allowing the opt-out provision to become a mechanism for bypassing Congress's carefully constructed scheme would frustrate the congressional intent that whistleblower claims be resolved at the agency level, if possible.[5]

---

[4] The opt-out provision also provides that a complainant may bring suit in federal court only if there is "no showing that such delay is due to the bad faith of the person seeking relief under this paragraph." 42 U.S.C. § 5851(b)(4). This requirement arguably would defeat district court jurisdiction if the employee *purposely* waited until the last minute to add a respondent to his agency complaint, so as to curtail the administrative process and obtain de novo review in district court (as opposed to deferential review in a circuit court of appeals following a final agency decision). But assuming, without deciding, that the bad-faith provision applies to this scenario does not resolve the issue this case raises. Whether motivated by benign or manipulative intent, the negative impact of belatedly adding a new respondent to the agency review process is the same.

[5] The conclusion we reach today on the exhaustion question differs from the precedent in the Title VII realm. "'Title VII charges can be brought against persons not named in an EEOC complaint as long as they were involved in the acts giving rise to the EEOC claims.'" *EEOC v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 847 (9th Cir. 2005) (quoting *Sosa v. Hiraoka*, 920 F.2d 1451, 1458–59 (9th Cir. 1990)). "'[W]here the EEOC or defendants themselves should have anticipated that the claimant would name those defendants in a Title VII suit, the court has jurisdiction over those defendants even though they were not named in the EEOC charge.'" *Id.* (quoting *Sosa*, 920 F.2d at 1459) (internal quotation marks omitted); *see also Ortez v. Washington Cnty.*, 88 F.3d 804, 808 (9th Cir. 1996).

Accordingly, we hold that before an employee may opt out of the agency process and bring a retaliation suit against a respondent in federal court, that respondent must have had notice of, and an opportunity to participate in, the agency action for one year. The format and level of specificity required to "name" a respondent in an agency complaint is a separate question, which we address in due course as it applies to this case.

**(2)** Given our holding regarding the need to identify respondents, Tamosaitis's claim against DOE fails for lack of administrative exhaustion. Tamosaitis's first agency complaint did not name DOE as a respondent, did not indicate that Tamosaitis intended to name DOE as a respondent, did not attribute any adverse employment actions to DOE, and did not allege that DOE participated in any of the actions from which Tamosaitis's complaint arose. The only role attributed to DOE in the original complaint is its status as manager of the Hanford site.

Not until the first amended OSHA complaint did Tamosaitis allege "DOE['s] possible involv[e]ment in retaliation," asserting that DOE was upset about an email that Tamosaitis sent out, and that he was removed "at the direction of . . . DOE WTP Federal Project Director Dale Knudson." But as these allegations against DOE were not made one year before Tamosaitis opted out of the

---

This difference reflects an important distinction between agency proceedings under Title VII and the ERA: Whereas EEOC proceedings under Title VII involve "informal methods of conference, conciliation, and persuasion," 42 U.S.C. § 2000e-5(b), ERA proceedings before DOL-OSHA are geared towards *adjudication* of a retaliation claim on the merits, *see* 29 C.F.R. § 24.105(a).

administrative review process, DOL-OSHA did not have the statutorily required period to consider them.

Because there was no administrative complaint pending against DOE for one year before Tamosaitis filed suit against DOE in federal court, section 5851(b)(4)'s administrative exhaustion requirement was not satisfied as against DOE. Accordingly, we affirm the dismissal of DOE from this litigation.[6]

**(3)** The district court ruled, and the URS entities maintain, that Tamosaitis similarly failed to exhaust his administrative remedies against them. According to the district court, once Tamosaitis changed respondent URS Inc. to URS Corp. and URS E&C, Tamosaitis had to wait another full year before bringing the suit to federal court against these defendants. We agree as to URS Corp. but not as to URS E&C.

The situation of URS E&C differs from that of both DOE and URS Corp. in a critical respect: The original complaint adequately notified URS E&C that it was the intended respondent. Accordingly, URS E&C's position was fully presented to the agency. URS E&C was therefore adequately named in the original complaint.

Tamosaitis's first agency complaint named "URS Inc." as respondent, but made clear that the intended respondent was "his employer" and the "Principal Subcontractor to Bechtel

---

[6] We note that Tamosaitis made no effort to file a separate suit against DOE, or to amend the complaint in this suit, once the year had expired. We therefore do not address whether the case against DOE could have gone forward had he done so.

. . . in a government contract . . . at the Hanford Nuclear Site." URS Corp. and URS E&C responded to Tamosaitis's administrative complaint in an eighteen-page position statement to DOL-OSHA. The statement acknowledges that Tamosaitis could only be referring to URS E&C, and explains the relationship between the URS entities, Bechtel, and Tamosaitis, as follows:

> Mr. Tamosaitis' employer is URS Energy & Construction, Inc., a wholly-owned subsidiary of URS Corporation. URS Energy & Construction, Inc., held the name Washington Group International, Inc. ("WG") when it entered into the WTP contract with BNI [Bechtel] ("the Subcontract"). Once URS acquired WG in November 2007, WG began doing business as the Washington Division of URS. It continued to conduct business in this name until February 2010 when the WG name was formally changed to URS Energy & Construction, Inc.

The position statement then goes on to acknowledge that URS E&C "employs Mr. Tamosaitis and is the party to the Subcontract."

The response addresses the merits of Tamosaitis's allegations in depth, attaching evidence in support of its position. At no point in the statement do the URS entities assert Tamosaitis's mistake in naming URS Inc. instead of URS E&C as a defense to the agency complaint.

Had URS E&C argued before DOL-OSHA that it was not adequately named in Tamosaitis's complaint, the argument

would not have had merit. Administrative complaints are generally less formal than their judicial counterparts. "[A]dministrative pleadings are liberally construed and easily amended." *Donovan v. Royal Logging Co.*, 645 F.2d 822, 826 (9th Cir. 1981).

Administrative complaints under the ERA's anti-retaliation provision fit this general mold. The whistleblower regulations make clear that "[n]o particular form of complaint is required." 29 C.F.R. § 24.103(b). Complaints may be made orally and reduced to writing by the agency. *Id.* OSHA's whistleblower manual confirms that employees are generally free to amend their complaints throughout the agency investigation so long as the amendment "falls within the scope of the original complaint." U.S. Dep't of Labor, OSHA Instruction, "Whistleblower Investigations Manual," § 3–13 (Sept. 20, 2011).

Further, under the ERA, DOL-OSHA complaints must be filed within 180 days of the alleged retaliatory conduct. 42 U.S.C. § 5851(b)(1). Combined with the accepted informality and fluidity of agency pleadings, this brief window means that some employees will misstate the exact name of an intended respondent, as Tamosaitis did with respect to URS E&C. Where, as here, neither the correct respondent nor DOL-OSHA had any difficulty identifying the proper respondent, a whistleblower's technical mistake in providing the precise name of the proper respondent should not be dispositive.

In short, Tamosaitis gave adequate notice to URS E&C that it was the named respondent to his complaint, such that URS E&C could be defended, and in fact was defended,

against the original agency complaint. We conclude that the administrative exhaustion was sufficient as to URS E&C.

URS Corp., however, was not adequately named in Tamosaitis's original administrative complaint. Tamosaitis did not assert in the complaint that URS Corp. was either his employer or a subcontractor to Bechtel at the Hanford site, and in fact it was not. Moreover, URS Corp.'s response to the original complaint noted as much, and stated that "references to URS in the remainder of this initial statement of position are to URS Energy & Construction, and not URS Corporation." Thus, URS Corp. affirmatively indicated that it was participating in the proceedings not as the alleged wrongdoer, but on behalf of URS E&C. Accordingly, we affirm the district court's dismissal of URS Corp. for lack of administrative exhaustion.

## B. Liability of URS E&C

**(1)** URS E&C assumed, for purposes of its summary judgment motion, that Tamosaitis engaged in protected activity and was retaliated against because of that conduct. The company moved for summary judgment only on the ground that it was not responsible for the retaliation. The district court agreed, holding that "Tamosaitis has not presented evidence raising a genuine issue of material fact that his employer, URS E&C, 'took adverse action because of his conduct,'" and that Bechtel was "solely responsible" for Tamosaitis's "removal from the WTP project." We hold that Tamosaitis introduced evidence sufficient to create a triable issue as to whether his whistleblowing activity was a contributing factor in the adverse employment action URS E&C took against him. Accordingly, we reverse the grant of summary judgment to URS E&C.

To establish a prima facie case of ERA retaliation, an employee must show: (1) he "engaged in a protected activity"; (2) "the respondent knew or suspected . . . that the employee engaged in the protected activity"; (3) "[t]he employee suffered an adverse action"; and (4) "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action." 29 C.F.R. § 24.104(f)(2); *cf. Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010) (interpreting the similarly structured whistleblower protection provision of the Sarbanes-Oxley Act); *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013) (interpreting the Federal Railroad Safety Act whistleblower statute). Under the ERA's burden-shifting approach to retaliation claims, if an employee shows that his participation in protected activity "was a contributing factor in the unfavorable personnel action alleged," the burden shifts to the employer. 42 U.S.C. § 5851(b)(3)(C); *see also Williams v. Admin. Rev. Bd.*, 376 F.3d 471, 476 (5th Cir. 2004). The employer may then rebut the employee's prima facie case by introducing "clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of [the employee's participation in] such behavior." 42 U.S.C. § 5851(b)(3)(D).[7]

Applying this statutory scheme to this case, we note, first, that there is plenty of evidence that Bechtel encouraged URS E&C to remove Tamosaitis from the WTP site because of his whistleblowing, that URS E&C knew that Tamosaitis's

---

[7] The 1992 amendments to the ERA added a burden-shifting procedure distinct from that established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–05 (1973). *See Trimmer v. U.S. Dep't of Labor*, 174 F.3d 1098, 1101 (10th Cir. 1999).

whistleblowing motivated Bechtel, and that URS E&C carried out the removal. Frank Russo, the Project Director for WTP and a Bechtel employee, forwarded URS E&C manager Gay an email from DOE personnel regarding Tamosaitis's email about the M3 closure, which read: "If this shows up in the press we will be sticking to our previous comment. Walt [Tamosaitis] does not speak for DOE . . . . Please use this message as you see fit to accelerate staffing changes . . . ." Introducing this string of emails, Russo wrote Gay: "Walt is killing us. Get him in your corporate office today." Gay replied: "Dennis [Hayes] has called. He will be gone tomorrow." The email is dated July 1, 2010, the day before Hayes, a URS E&C employee, removed Tamosaitis from the Hanford site. Another email dated July 1 from Russo, introducing the same email chain but sent to a DOE official, said that Russo was "livid about the string of emails Walt has sent in the last 2 days," and that "[t]oday I told Gay that Walt will no longer be paid by WTP."

The thrust of the email chains are assuredly that Bechtel, and DOE, were extremely unhappy with Tamosaitis's participation in protected activity and wanted him off the project.[8] A reasonable factfinder could infer not only that the retaliatory motive of URS E&C's customer, Bechtel, spurred URS E&C's actions against Tamosaitis, but also that URS E&C knowingly acquiesced in or ratified Bechtel's retaliation. A reasonable factfinder could also conclude that

---

[8] We decline URS E&C's invitation to apply judicial estoppel in this case. For the reasons explained, Tamosaitis's insistence in state court that Bechtel "was behind the decision to remove" him from the WTP is not "clearly inconsistent" with the argument that URS E&C retaliated against Tamosaitis by carrying out Bechtel's request. *See Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012).

there is not clear and convincing evidence that URS E&C would have taken the same action had Tamosaitis not engaged in protected activity.

Under the ERA's whistleblower protection provision, such showings, if established at trial, are sufficient to make URS E&C liable for retaliatory discrimination against Tamosaitis. The ERA forbids an employer from discriminating against an employee based on the employee's whistleblowing activities even if the adverse action is taken to maintain an advantageous business relationship. *Cf. Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 609 (9th Cir. 1982); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276–77 (9th Cir. 1981). The purpose of the ERA's anti-retaliation provision is to root out retaliation against whistleblowers, for the benefit of both the public and the employee. "It would be totally anomolous if we were to allow the preferences . . . of [a] customer[ ] to determine whether the . . . discrimination was valid." *Gerdom*, 692 F.2d at 609 (quoting *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir. 1971)). We hold that where an employer takes an adverse employment action to satisfy a customer with a retaliatory motive of which the employer is aware, retaliation is a "contributing factor," 42 U.S.C. § 5851(b)(3)(C), in the employer's decision to take that action.

Under this framework, the presence of an employer's subjective retaliatory animus is irrelevant. All a plaintiff must show is that his "protected activity was a contributing factor in the adverse [employment] action." 29 C.F.R. § 24.104(f)(1). The relevant causal connection is not between retaliatory animus and personnel action, but rather between *protected activity* and personnel action. As a result, there is no meaningful distinction between an employer who takes

action based on its own retaliatory animus and one that acts to placate the retaliatory animus of a customer. Either way, the fact that the employee engaged in protected activity is the cause of the action taken against him.

In the analogous context of Title VII actions, we have long held that a customer's discriminatory preference does not justify an employer's discriminatory practice unless — for those protected categories for which the defense is available under Title VII — the discriminatory requirement amounts to a bona fide occupational qualification. *See* 42 U.S.C. § 2000e-2(e); *Gerdom*, 692 F.2d at 609; *Fernandez*, 653 F.2d at 1276–77. Implicit in such holdings is the commonsense conclusion that when a known or attributed discriminatory customer preference motivates an adverse employment action, the discriminatory preference is a cause of the employment action.

Since Tamosaitis has shown that his protected activity was a "contributing factor" in the adverse employment action he suffered, he has met his burden for establishing a prima facie case of retaliation under the ERA. The ERA contains no bona fide occupational qualification defense. Instead, where retaliation is a contributing factor to an employer's adverse action, the statute requires that the employer demonstrate by clear and convincing evidence that it would have taken the adverse action even if the employee had not participated in the protected activity. 42 U.S.C. § 5851(b)(3)(D).

On the present record, URS E&C has made no such showing. The only relevant argument URS E&C makes is that it had no choice under its contract with Bechtel to continue to employ someone on the Hanford project if

Bechtel demanded that that person be removed, regardless of the reason for the request. But this suggestion is unavailing.

A trier of fact could conclude that URS E&C's contract with Bechtel did not require URS E&C to transfer an employee if requested to do so for a known retaliatory reason. The contract provides that, "All work under this contract shall be performed in a skillful and workmanlike manner. The Contracting Officer may require, in writing, that the Contractor remove from the work any employee the Contracting Officer deems incompetent, careless or otherwise objectionable." No one contends that Tamosaitis was "incompetent" or "careless." Thus the question is whether the term "otherwise objectionable" is broad enough to encompass unlawful, retaliatory objections. As "a general phrase at the end of a list is limited to the same type of things (the generic category) . . . found in the specific list," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 203 (2012) (quoting William D. Popkin, *A Dictionary of Statutory Interpretation* 74 (2007)), "otherwise objectionable," read in light of the preceding criteria, best refers to concerns regarding an employee's work quality and productivity, not to an employee's protected airing of public safety concerns. *See also Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 933 (9th Cir.) *as amended by* 313 F.3d 1093 (9th Cir. 2002). For example, if Bechtel viewed disabled or female employees as undesirable, the "otherwise objectionable" language would not confer the right to order such employees discharged without regard to their productivity, on-the-job honesty, or other criteria related to their ability to perform their jobs.

Supporting this reading of "otherwise objectionable" as not reaching retaliation or other proscribed reasons is the

consideration that a contract requiring compliance with a transfer or discharge demand triggered by a known retaliatory reason could be void or unenforceable as against public policy. *See Restatement (Second) of Contracts* § 178 (1981); *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983) (a court may not enforce a discriminatory contract contrary to public policy). Reading "otherwise objectionable" as not encompassing impermissible motivations avoids that possibility. *Cf. Restatement (Second) of Contracts* § 207 (1981) (ambiguous contracts are to be read consistently with the public interest).

Moreover, an employer may be liable for the retaliatory conduct of another entity "where the employer either ratifies or acquiesces" in the retaliation "by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997). Viewing the record in the light most favorable to the non-movant, Tamosaitis, as we must on summary judgment, *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009), it supports the reasonable inference that URS E&C ratified Bechtel's retaliation by transferring Tamosaitis, despite knowledge of Bechtel's retaliatory motive. Equally supported is the reasonable inference that URS E&C could have refused to carry out Tamosaitis's removal but failed to do so.

URS E&C supervisor Bill Gay acknowledged that if Bechtel ordered him to transfer a woman and he knew the request was motivated by sexual animus, he would *not* immediately cede to the request, and would instead take the issue to his corporate headquarters in protest. A jury could view this evidence as supporting the reasonable inference that

URS E&C retained some control over staffing decisions at the Hanford site.  *See* 42 U.S.C. § 5851(b)(3)(C) (protected activity need only be a "contributing factor in unfavorable personnel action alleged").

**(2)**   As a separate ground for granting URS E&C summary judgment on Tamosaitis's retaliation claim, the district court held that "[n]othing in the record creates a genuine issue . . . that URS E&C has discriminated against [Tamosaitis] with respect to his compensation, terms, conditions, or privileges of employment in violation of the ERA."   The district court cited the fact that Tamosaitis continues to receive bonuses and has had other meaningful work assignments since the WTP.

"By its terms, section 5851(a) prohibits . . . employers from discriminating in practically any job-related fashion against an employee because the employee [engaged in protected activity]."  *DeFord*, 700 F.2d at 286.  Transfer to "less desirable employment" is job-related discrimination under the ERA.  *Mackowiak v. Univ. Nuclear Sys., Inc.*, 735 F.2d 1159, 1162 (9th Cir. 1984); *see DeFord*, 700 F.2d at 287.

Tamosaitis attests that his "current job duties vary dramatically" from his previous position at Hanford.   At Hanford he supervised a 500 million dollar program involving fifteen-to-fifty employees.   Now, he does not supervise any programs, and no employees report to him. Since January 1, 2012, he has not received an annual bonus as he did at Hanford, thereby losing $30,000 to $100,000 in compensation each year.   Of the alternative employment opportunities URS E&C offered Tamosaitis, the primary one was in another country, a transfer undesirable for him because

of his family ties in the United States. The evidence thus creates a genuine issue of fact as to whether Tamosaitis's compensation, terms, conditions, or privileges of employment were affected by his transfer.

Accordingly, we reverse the grant of summary judgment to URS E&C for ERA whistleblower retaliation.

## III.

Having determined that Tamosaitis's suit against URS E&C may proceed to trial, we turn to whether Tamosaitis has a right to trial by jury. The district court granted URS E&C's motion to strike Tamosaitis's jury demand, ruling that Tamosaitis had neither a statutory nor a constitutional right to a jury trial for his claim under the opt-out provision of the ERA whistleblower protection provision. We hold that Tamosaitis has a constitutional right to a jury trial for his claims seeking money damages against URS E&C and so reverse the district court's ruling.

### A.  Statutory Right to Jury Trial

Before reaching a constitutional question, a court must "first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999) (alteration in original) (quoting *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 345 (1998)). Accordingly, before proceeding to hold that there is a constitutional jury trial right in cases filed under 42 U.S.C. § 1983, *Monterey* determined that there was no statutory right to trial by jury under section 1983. *Id.*

The appellees in *Monterey* maintained that the term, "action at law," used in the statute was a "term of art implying a right to a jury trial." *Id.* at 707–08. The Court disagreed that "this [was] . . . a necessary implication," and "decline[d] . . . to find a statutory jury right under § 1983 based *solely* on the authorization of 'an action at law.'" *Id.* at 708 (emphasis added). In doing so, *Monterey* distinguished section 1983 from the Age Discrimination in Employment Act of 1967 ("ADEA") at issue in *Lorillard v. Pons*, 434 U.S. 575 (1978), explaining that *Lorillard* held that there was a statutory right to a jury trial "*in part* because [the ADEA] authorized '*legal* . . . relief,'" and in part because of the ADEA's "explicit incorporation of the procedures of the Fair Labor Standards Act, which had been interpreted to guarantee trial by jury in private actions." *Id.* (first emphasis added) (citing *Lorillard*, 434 U.S. at 580).

Like section 1983, the ERA provides for "an action at law or equity for de novo review," 42 U.S.C. § 5851(b)(4), and makes no express reference to a jury trial. *Cf.* 42 U.S.C. § 1981a(c)(1) ("If a complaining party seeks compensatory or punitive damages under this section . . . any party may demand a trial by jury"); 46 U.S.C. § 30104 ("A seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury."). Although the phrase "action at law" is consistent with a statutory right to jury trial, the phrase standing alone is under *Monterey* insufficient to establish a statutory jury trial right for ERA whistleblower suits. *See Monterey*, 526 U.S. at 708.

## B.  Constitutional Right to Jury Trial

"Given this statutory silence, we must answer the constitutional question presented." *Tull v. United States*,

481 U.S. 412, 417 n. 3 (1987). The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury *shall be preserved* . . . ." U.S. Const. amend. VII (emphasis added). This constitutional guarantee "appl[ies] to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis v. Loether*, 415 U.S. 189, 194 (1974).

"Consistent with the textual mandate that the jury right be preserved, . . . interpretation of the Amendment has been guided by historical analysis." *Monterey*, 526 U.S at 708. In applying that analysis, we "examine both the nature of the statutory action and the remedy sought," *Feltner*, 523 U.S. at 348, to determine whether the claim at issue is a "cause of action that either was tried at law at the time of the founding or is . . . analogous to one that was," *Monterey*, 526 U.S. at 708 (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376 (1996)). Consideration of the remedy sought is the critical factor in this analysis. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989); *Spinelli v. Gaughan*, 12 F.3d 853, 855–56 (9th Cir. 1993).

*Monterey* held that a section 1983 suit "seeking legal relief is an action at law within the meaning of the Seventh Amendment" even though there was no action equivalent to section 1983 at the time the Seventh Amendment was adopted. 526 U.S. at 709. The constitutional right to a jury trial, *Monterey* determined, "extends to statutory claims unknown to the common law, so long as the claims can be said to 'soun[d] basically in tort,' and seek legal relief." *Id.* (quoting *Curtis*, 415 U.S. at 195) (alteration in original). As the plaintiff in *Monterey* sought compensatory damages, and

because "compensation is a purpose 'traditionally associated with legal relief,'" *id.* at 710–11 (quoting *Feltner*, 523 U.S. at 352), the Court concluded the remedy sought was a legal one, *id.* at 710.

Tamosaitis's whistleblower suit also "sounds in tort" and seeks compensatory damages. His lawsuit is analogous to a wrongful discharge claim at common law, "a tort so widely accepted in American jurisdictions today we are confident that it has become part of our evolving common law." *Spinelli*, 12 F.3d at 857. "[W]herever the [retaliatory discharge] tort has been recognized, it has been treated as legal and not equitable." *Id.* Although Tamosaitis is not alleging complete termination, his claim for wrongful transfer is for present purposes sufficiently analogous to wrongful discharge for us to conclude that the nature of the statutory right is legal. *See Monterey*, 626 U.S. at 709.[9]

Most critically, the ERA anti-retaliation provision, section 5851, expressly authorizes award of "compensatory damages" to a complainant. 42 U.S.C. § 5851(b)(2)(B). As

---

[9] Although some state courts do not recognize adverse employment claims falling short of actual or constructive discharge, *Restatement (Third) of Employment Law* § 5.01 cmt. *c.* at 188 (Proposed Final Draft 2014), "[t]wo state supreme courts have explicitly sustained 'wrongful demotion' claims and a few intermediate appellate courts have either sustained claims of this type or indicated their approval of such claims," § 5.01 cmt. *c.* reporters' notes at 198 (collecting cases). Those courts that do allow such claims emphasize that they are analogous to wrongful discharge claims. *See, e.g.*, *Garcia v. Rockwell Int'l Corp.*, 187 Cal. App. 3d 1556, 1562 (Ct. App. 1986), *abrogated on other grounds by Gantt v. Sentry Ins.*, 1 Cal.4th 1083 (1992), *overruled on other grounds by Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 80 n.6 (1998); *Brigham v. Dillon Cos.*, 262 Kan. 12, 20 (1997); *Trosper v. Bag 'N Save*, 273 Neb. 855, 864 (2007).

one commentator has noted: "It is established law that 'compensatory damages' are available under the ERA whistleblower provision and other environmental whistleblower statutes and that 'compensatory damages' under these statutes means non-pecuniary damages, which include recovery for mental anguish, emotional distress, pain and suffering, humiliation, and loss of professional reputation." Jarod S. Gonzalez, *Sox, Statutory Interpretation, and the Seventh Amendment: Sarbanes-Oxley Act Whistleblower Claims and Jury Trials*, 9 U. Pa. J. Lab. & Emp. L. 25, 45 & n.125 (2006) (collecting cases).

Although he also requests injunctive relief, "back pay . . . and lost benefits," Tamosaitis seeks compensatory damages for "loss of enjoyment of life, pain and suffering, mental anguish, emotional distress, injury to reputation, and humiliation." "And there is overwhelming evidence that the consistent practice at common law was for juries to award damages." *Feltner*, 523 U.S. at 353. Accordingly, both the nature of the claim (wrongful transfer) and, more importantly, the nature of the relief sought (compensatory damages) support a right to trial by jury.

URS E&C argues that the monetary relief Tamosaitis seeks is intertwined with and incidental to the injunction sought, so his overall suit sounds in equity.[10]   But

---

[10] URS E&C argues that compensatory damages under the ERA are discretionary, and suggests that their discretionary nature makes them equitable, rather than legal, relief. Not so. While the statute provides that upon finding an employer has violated the statute, the adjudicator "may order . . . compensatory damages," 42 U.S.C. § 5851(b)(2)(B), this formulation reflects that an award of compensatory damages depends on proof of the damages alleged. *See Curtis*, 415 U.S. at 189–90, 197 (interpreting statute providing that "court . . . may award to the plaintiff

Tamosaitis's prayer for monetary relief extends beyond back pay, a form of monetary relief that, when restitutionary or "incidental to . . . injunctive relief," is fairly characterized as equitable. *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570–71 (1990); *see Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1069 (9th Cir. 2005). He also requests reputational damages and mental and emotional damages. Such damages are not merely incidental to the equitable relief of reinstatement. *See Tull*, 481 U.S. at 425; *Curtis*, 415 U.S. at 196 n.11. And where a statute authorizes both equitable and legal relief, the plaintiff's decision to "join[ ]" a legal claim with an equitable claim does not "abridge[ ]" "the right to jury trial on the legal claim." *Curtis*, 415 U.S. at 196 n.11. It is irrelevant whether an action is properly characterized "as one for damages and injunctive relief, or as one for damages alone, for purposes of analyzing the jury trial issue." *Id.*

In denying Tamosaitis a jury trial, the district court added a third factor to the constitutional inquiry: Whether the plaintiff's suit vindicates a private or public right. The district court concluded that when "Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal," as it undisputedly can—and does—with respect to ERA retaliation claims, "the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." In the district court's view, because the whistleblower provision vindicates a "public right" over which Congress has conferred adjudicatory power to DOL-OSHA, the Seventh Amendment does not require a jury trial

---

actual damages" to mean that "if a plaintiff proves unlawful discrimination and actual damages, he is entitled to judgment for that amount").

when, under the ERA's opt-out provision, the claim is heard instead in federal court.

This analysis mistakenly conflates two separate issues — (1) when Congress may assign claims involving public rights to non-Article III adjudicatory bodies, and (2) whether, when such claims are assigned to federal courts for adjudication, there is a constitutional jury trial right. *Granfinanciera* concerned the first issue, holding that Congress can give non-Article III courts the power to make findings of fact as to claims involving public rights. 492 U.S. at 51–52.

In so holding, *Granfinanciera* made its narrow scope clear: "Congress may devise novel claims of action involving public rights free from the strictures of the Seventh Amendment *if* it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders." *Id.* at 52 (emphasis added). "Congress is not required by the Seventh Amendment to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative species with special competence in the relevant field," and "*[t]his is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned to a federal court of law instead of an administrative agency.*" *Id.* at 51 n.9 (emphasis added) (quoting *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 455 (1977)).

Thus, the right to a jury trial "turn[s] to a considerable degree on the nature of the forum in which a litigant [finds] himself." *Atlas Roofing*, 430 U.S. at 458. Consistent with this framework, Congress may confer adjudicatory authority of a new statutory right to an administrative process "with

which [a] jury would be incompatible." *Id.* at 450. But where Congress provides for federal district court authority over a public statutory right — here, after a non-Article III tribunal had an opportunity to rule on the case and failed to do so — the considerations that permit agency determination of such rights without triggering Seventh Amendment concern disappear.

In the ERA's opt-out provision, "Congress . . . chose an aggressive timetable for resolving whistleblower claims and . . . created a cause of action in an alternative forum should the DOL fail to comply with such schedule." *Stone*, 591 F.3d at 248 (4th Cir. 2009) (construing the Sarbanes-Oxley Act). Congress thereby gave an administrative agency a "first crack" at resolving the dispute; after one year, jurisdiction is available in federal courts, at which point any findings made by the agency have no preclusive effect. *See id.* at 247. In sum, absent a final decision from the agency within the specified period, "the employee may . . . file a federal civil cause of action," *Day v. Staples, Inc.*, 555 F.3d 42, 53 (1st Cir. 2009), and the "proceedings begin anew in district court," *Stone*, 591 F.3d at 248.

Assuming, as we do for present purposes, that the agency is properly vested with the ability to hear and make findings as to such a dispute without a jury, the fact that Congress has given adjudicatory power to DOL-OSHA in the first instance does not cut away the constitutional right to a jury when the suit moves to federal court. Put differently, once the retaliation claim is in the district court — a forum which traditionally employs juries and is constitutionally obliged to do so for claims meeting certain criteria — a cause of action meeting those criteria is not shorn of a jury trial right because

it could have been decided by an administrative agency without a jury.

For these reasons, we conclude that Tamosaitis has a right to a jury trial in the district court for his claims seeking money damages under section 5851(b)(4), and we reverse. We note that this holding extends to plaintiffs and defendants alike: An employer hailed into federal court to defend against a whistleblower retaliation suit for money damages may demand the constitutional protection of a trial by jury.

## IV.

For the reasons explained, we affirm the dismissal of DOE from this suit, and also affirm the grant of summary judgment in URS Corp.'s favor. We reverse the grant of summary judgment for URS E&C and remand to the district court for further proceedings consistent with this opinion.[11]

## AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

---

[11] Tamosaitis asks that we remand to a different judge. We deny the request. We "remand to a different district judge if a party can show personal biases or unusual circumstances, based on an assessment of three factors: (1) whether on remand the district judge can be expected to follow this court's dictates; (2) whether reassignment is advisable to maintain the appearance of justice; and (3) whether reassignment risks undue waste and duplication." *United States v. Lyons*, 472 F.3d 1055, 1071 (9th Cir. 2006) *as amended on reh'g in part* (Jan. 11, 2007) (citing *United States v. Peyton*, 353 F.3d 1080, 1091 (9th Cir. 2003), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135, 1136 (9th Cir. 2010) (en banc)). Here, there is no indication of personal bias or other unusual circumstances. The district court judge erred in some respects but not others, and we have absolutely no reason to believe he will not follow our rulings on remand. Nor do the other two factors apply.